STATE of Maine

v.

Bruce MILLETT.

Supreme Judicial Court of Maine.

Oct. 19, 1978.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., Portland, Scott McGill, Law Student (orally), Stephen Devine, Law Student (orally), for plaintiff.

Lawrence J. Zuckerman (orally), Portland, for defendant.

Before POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ., and DUFRESNE, A. R. J.

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered

DUFRESNE, Active Retired Justice.[1]

On April 6, 1976 the Grand Jury in and for the County of Cumberland in an indictment containing two counts charged the defendant, Bruce Millett, with having in his possession on two separate occasions on April 5, 1976 a firearm capable of being concealed, to wit, a handgun, in violation of 15 M.R.S.A., § 393, which prohibited such possession in the case of a person convicted of a felony during the period of five years next immediately following his discharge or release from prison or termination of probation. One Timothy James was simultaneously indicted for armed assault on Jessie J. Osborne in violation of 17 M.R.S.A., § 201–A. On motion of the State, the two indictments were consolidated for trial pursuant to Rule 13, M.R.Crim.P. over Millett's objection. The jury acquitted Millett upon the later episode as charged in the second count of the indictment against him, but brought in guilty verdicts in connection with the other accusations. Millett appeals from the judgment of conviction against him alleging as error, (1) the insufficiency of the evidence as a whole to support a conviction for violation of 15 M.R.S.A., § 393 and (2) the insufficiency of the evidence in the following particulars, (a) the State failed to prove that the instrument he possessed was in fact a firearm within the meaning of 15 M.R.S.A., § 393, or (b) the evidence did not affirmatively show that the gun was in operable condition, i. e. capable of firing a projectile, at the time he is accused of having possession of such an item. As a third point of appeal, the defendant claims that the Justice below committed reversible error in granting the State's motion for consolidation of his trial with that of Timothy James.

We deny the appeal.

### 1. *Insufficiency of the evidence*

This ground of appeal was properly preserved for appellate review, since the de-

and authorized to continue his participation in the case in his capacity of Active Retired Justice.

fendant did move, within ten days after verdict, for a new trial or in the alternative for a judgment of acquittal pursuant to Rules 33 and 29(b), M.R.Crim.P. See *State v. Brewer*, Me., 325 A.2d 26, 27 (1974). As stated in *State v. O'Clair*, Me., 292 A.2d 186, 196 (1972):

> "Motions for acquittal and for a new trial based upon the insufficiency of the evidence to support the verdict of guilt present like questions and accomplish precisely the same result. They are conceptually and factually interchangeable."

■ Generally speaking, the question on appeal raised by a motion for new trial or for judgment of acquittal is whether, in view of all the evidence in the case, the jury was warranted in believing beyond a reasonable doubt that the accused was guilty of the crime charged against him. *State v. O'Clair*, supra, at page 196; *State v. Goldman*, Me., 281 A.2d 8, 12 (1971); *State v. Wright*, 128 Me. 404, 148 A. 141 (1929). Stated otherwise, the issue is whether, in view of all the evidence in the case, there was legally sufficient evidence to support the guilty verdict. *State v. Burnham*, Me., 350 A.2d 577, 582 (1976); *State v. Westphal*, Me., 349 A.2d 168, 169 (1975).

■ Appellate review of the sufficiency of the evidence must be made, however, in the light of the rule that issues of credibility of witnesses are the exclusive prerogative of the jury to resolve. *State v. Brewer*, supra, at page 28; *State v. O'Clair*, supra, at page 196; *State v. Trask*, Me., 223 A.2d 823, 824 (1966).

■ A review of the evidence which the jury could and did accept lends support to the following facts. On April 5, 1976 Jessie Osborne was at work in Portland at a car wash establishment where he was buffing cars. During the early part of the afternoon, Bruce Millett, in the company of the codefendant James, entered the car wash plant and stood leaning against the wall a short distance away, while James accosted Osborne in a belligerent manner. Millett was carrying a pistol the brown colored handle of which with trigger hammer was protruding from his belt in plain view of Osborne. Benito Conti, the owner of the car wash site, immediately intervened, asked the two gentlemen to leave, which they did, and thus broke up a potential confrontation.

At about seven o'clock in the evening, Osborne and Conti, with two young girls who had worked that afternoon at the car wash location, were preparing to leave in Conti's car, when James, who had stationed his van in the park on the other side of the street from the establishment, voiced threatening remarks at Osborne, brandished a shotgun and fired it in his direction, causing some leaves and dirt to fly in the air. Osborne and the girls jumped in Conti's car to hide and avoid being hit by any possible additional shotgun blast, while Conti walked over to talk to James and Millett. Mr. Conti's efforts proved successful and the van left the area.

The evidence presented a factual question upon which the jury was warranted to find guilt beyond a reasonable doubt.

### 2. *Real firearm in operable condition*

The defendant contends, however, that, here, the jury was not warranted *under the law* applicable to the facts of the case to find guilt beyond a reasonable doubt on the ground that the evidence was insufficient to support proof beyond a reasonable doubt that the instrument possessed by Millett on the afternoon of April 5, 1976 was a real firearm capable of firing a projectile within the meaning of 15 M.R.S.A., § 393. See *State v. Arsenault*, 152 Me. 121, 124 A.2d 741 (1956).

The statute under which the defendant was convicted (15 M.R.S.A., § 393)[2] then provided:

**2.** Section 393 of Title 15 was repealed by Public Laws 1977, c. 225, § 2 and a new section 393 was enacted effective October 24, 1977 which among other things extended explicitly the code definition of the term "firearm" to the statutory regulation of the possession of firearms by a felon. But, as indicated in footnote 2 in *State v. Smith*, Me., 379 A.2d 722, at page 727, this was a mere clarification process.

"It shall be unlawful for any person who has been convicted of a felony under the laws of the United States or of the State of Maine, or of any other state, to have in his possession any pistol, revolver or any other firearm capable of being concealed upon the person until the expiration of 5 years from the date of his discharge or release from prison or termination of probation.

\*    \*    \*    \*    \*    \*

Anyone violating any of the provisions of this chapter shall be guilty of a felony, and upon conviction thereof, shall be punished  . . . ."

The charging document in pertinent part reads as follows:

"THE GRAND JURY CHARGES:
COUNT I

That on or about the Fifth day of April, 1976, in the City of Portland, County of Cumberland and State of Maine, the above named defendant BRUCE MILLETT did have in his possession a firearm capable of being concealed, to wit: a handgun, the said defendant having been discharged from a Maine State Prison sentence  . . . ."

The defendant contends that 15 M.R.S.A., § 393 does not apply to possession by a felon within the stated period of time of an imitation or toy gun and that from the evidence it is as consistent as otherwise that the so-called pistol about which Osborne testified was not a real firearm. We disagree.

We note that the legislation regulating the possession of firearms by a felon did not, prior to the enactment of the code, define the term "firearm" except as it involved its concealability, the statute (15 M.R.S.A., § 391), providing, as it did, that

"the following words and phrases when used in this chapter [15] are defined as follows:

'Pistol,' 'revolver' and 'firearm' mean a weapon capable of being concealed upon the person and shall include all firearms having a barrel of less than 12 inches in length."

We are aware that the Legislature by Public Laws 1971, chapter 539, section 21, enacted the following definition of a firearm (17 M.R.S.A., § 4001(2)):

"2.  Firearm.  'Firearm' shall include any pistol, revolver, rifle, shotgun, machinegun, automatic and semiautomatic rifle or other firearm as the term is commonly used, or any gun, device or instrument in the nature of a weapon from which may be fired or projected any solid projectile or slug, pellet, missile or bullet or any gas, vapor or other nocuous thing by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances; *or any other instrument that has the appearance of a firearm even though not capable of discharging a projectile.*" (Emphasis supplied)

This definitional provision was enacted as an integral part of the Legislature's comprehensive scheme to enhance the punishment for certain crimes when committed while armed with a firearm.  But the introductory clause of section 4001 expressly limits the application of the reference definition of "firearm," in that it states

"[t]he following words, terms and phrases when used in this Title [meaning Title 17] and in Title 34 shall have the meaning ascribed to them in this section,"

thus lending support to the claim that the old maxim—expressio unius est exclusio alterius—is controlling and prevents the applicability of this belated definition to the term "firearm" as used in Title 15, Section 393.

But, in line with what this Court said in *City of Portland v. New England Tel. & Tel. Co.*, 103 Me. 240, 249, 68 A. 1040, 1043 (1907)—

"Whether the expression of one thing is to operate as the exclusion of another, is ordinarily a question of intention, to be gathered from an examination of all parts of a statute by the aid of the usual rules of interpretation,"—

it might be argued that the overall motivation of our Legislators in enacting section 4001 of title 17 in 1971 was to provide a

definitional standard for all statutes in pari materia including 15 M.R.S.A., § 393, even though the introductory clause omitted any reference to the latter statute in stating the reach of the amendatory act. Indeed, legislation providing for increased penalties in the case of recidivism on the part of felons (15 M.R.S.A., § 1742) or for mandatory sentences in convictions of crime involving the use of firearms reflects a common purpose on the part of the Legislature to cut down the ever increasing criminal activity of this era. Such legislation was enacted for its deterrent effect upon the criminally inclined person who might otherwise be tempted to continue, or embark upon, a life-style of crime. See *State v. Heald,* Me., 382 A.2d 290 (1978); *State v. Maxwell,* Me., 328 A.2d 801 (1974). To what we said in *State v. Smith,* Me., 379 A.2d 722, 726 (1977) in reference to 15 M.R.S.A. § 393

—"[t]he legislature could, with understandable reason, proscribe the carrying of any apparent weapon by a convicted felon, to which there might be violent reaction, even though the weapon was in fact inoperable,"—

we might add that ascribing such legislative intendment to the regulatory provisions of firearm-possession by felons would enhance the same purposes as motivated the Legislature in enacting the recidivist and mandatory sentence statutes.

On the other hand, we recognize the fundamental principle of statutory construction that penal statutes are to be construed strictly. *State v. Heald,* supra, at page 294; *Duncan v. State,* 158 Me. 265, 183 A.2d 209 (1962), cert. den., 371 U.S. 867, 83 S.Ct. 129, 9 L.Ed.2d 104. Also, we have in mind that the rule of strict construction of a penal law is subordinate to this other rule, that the judicial interpretation must be reasonable and sensible, with a view to effectuating the legislative design and the true intent of the Legislature. *State v. Seaburg,* 154 Me. 210, 145 A.2d 559 (1958). But we must not lose sight of the overall principle that, where the language of a statute in plain and unambiguous, there is no occasion for resorting to the rules of statutory interpretation. *Chase v. Edgar,* Me., 259 A.2d 30, 32 (1969).

In the face of the specific limitation of the introductory clause of the 1971 legislation which omits any reference to 15 M.R. S.A., § 393, can we avoid the rule of strict construction respecting section 393 of title 15? See *State v. Granville,* Me., 336 A.2d 861, 863 (1975).

We are aware that this Court has adopted a more liberal construction respecting statutes dealing with firearms. In *State v. Farmer,* Me., 324 A.2d 739 (1974), we rejected the argument that the armed assault statute should be construed in such narrow stricture as to require for conviction that the weapon with which the person was armed must be used to assist in the commission of the foundational assault. Again, in *State v. Maxwell,* Me., 328 A.2d 801 (1974), this Court ruled that a person could be convicted of armed assault and battery within the meaning of the mandatory sentence statute, even if the weapon possessed by the accused at the time was not loaded.

Assuming, however, that the introductory clause of the 1971 amendment (17 M.R.S.A., § 4001) is clear and unambiguous and that the comprehensive definition of the term "firearm" as spelled out therein cannot be used in our interpretation of that word in title 15, section 393, we find that the lexicographers also, in their definition of the word "firearm," do not carry the comprehensive concept espoused by the 1971 amendment. In the Compact Edition of the Oxford English Dictionary (1971) a firearm is "[a] weapon from which missiles are propelled by the combustion of gunpowder or other explosive"; in The Random House Dictionary of the English Language (unabridged ed. 1967), it is "a small arms weapon from which a projectile is fired by gunpowder"; in Webster's Third New International Dictionary (1961), it is "a weapon from which a shot is discharged by gunpowder—usu. used only of small arms"; in The American Heritage Dictionary of the English Language (1973), it is "[a]ny weapon capable of firing a missile, especially a pistol or rifle using an explosive charge as a

propellant"; in Funk & Wagnalls New Standard Dictionary of the English Language (1938), it is "[a]ny weapon from which a missile, as a bullet, ball, or shell, is hurled by an explosion, as gunpowder"; and in A Dictionary of American English (1940), it is "[a] weapon from which projectiles are discharged by explosives."

Hence, if the rule of strict construction of a penal statute is to prevail, we would have to conclude that, in making it unlawful for a convicted felon to have in his possession during the stated 5-year period of time any pistol, revolver or any other firearm capable of being concealed upon the person as provided by 15 M.R.S.A., § 393, the Legislature used the word "firearm" in its natural and ordinary signification—meaning that the instrument must be a real pistol, revolver or firearm and that it must be operable or readily capable of being made operable as a firearm.[3]

Such seems to be the rule of the majority of jurisdictions that faced the problem of construing statutes which prohibited in general terms the use or possession of firearms. See e. g. *State v. Lawr,* 263 N.W.2d 747 (Iowa 1978), where the barrel of the weapon was plugged and it could not readily be adapted or modified to accomplish the design for which it was made, i. e. to fire a projectile or bullet, the Iowa Court held that the gun was not a "firearm" within the meaning of the word as used in the statute prohibiting a person from going "armed with a pistol, revolver or other firearm." See also *State v. Keely,* 153 N.J.Super. 18,

378 A.2d 1155 (1977); *Howell v. State,* 278 Md. 389, 364 A.2d 797 (1976) involving a tear gas gun; *Couch v. Commonwealth,* 255 S.W.2d 478 (Ky.1953). Cf. *People v. Halley,* 131 Ill.App.2d 1070, 268 N.E.2d 449 (1971); *People v. Jiminez,* 27 Mich.App. 633, 183 N.W.2d 853 (1970).

■ At trial, the issue of "real" gun as opposed to a "toy" pistol and operability of the weapon, as required proof under the statute to support a conviction, was discussed between counsel and the Court in the absence of the jury in relation to a motion for judgment of acquittal and in preparation for the Justice's instructions to the jury. As a result of these discussions, the Justice below gave the following instructions (the pertinent portions only being reproduced):

"Firearm shall include any pistol, revolver, rifle, shotgun, machine gun, automatic and semi-automatic rifle, or other firearm as the term is commonly used or any gun, device or instrument in the nature of a weapon from which may be fired or projected any solid projectile or slug, pellet, missile or bullet or any gas vapor or other nocuous thing by means of cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances. That is an all-inclusive kind of definition. It is not necessary that you find that the instrumentality in this particular case meet all of those; as long as it meets one of those aspects of this definition, then you may

---

**3.** This is the new policy which the code has adopted. A consideration of 17–A, § 2(12–A) will clearly illustrate it. It reads as follows:

" 'Firearm' means any weapon, whether loaded or unloaded, which will expel a projectile by the action of an explosive and includes any such weapon commonly referred to as a pistol, revolver, rifle, gun, machine gun or shotgun. Any weapon which can be readily made into a firearm by the insertion of a firing pin, or other similar thing in the actual possession of the actor or an accomplice, is a firearm."

This is a departure from the legislative policy introduced by the 1971 amendment (Public Laws 1971, c. 539, s. 21), which included in the definition of a "firearm" not only real firearms, but also "any other instrument *that has the*

*appearance of a firearm* even though not capable of discharging a projectile" as said amendment was made applicable to stated statutory crimes committed while armed with a firearm. Such new policy definition is now applicable to the new section 393 of title 15, requiring the State to prove both concealability and operability of the firearm in order to establish a violation of 15 M.R.S.A., § 393. See *State v. Smith,* Me., 379 A.2d 722 (1977).

We take notice that 15 M.R.S.A., § 391, which defined "firearm" when applicable to 15 M.R.S.A., § 393 as it stood at the time of the commission of the crime charged in this case, was repealed by the Corrections of Errors and Inconsistencies Act. Public Laws, 1977, c. 696, s. 166.

find that the individual defendant in this case [Bruce Millett] did have such a firearm in his possession, . . .. Basically what I am saying is that it is not a toy gun, it is not a cap gun, because a cap pistol is not capable of being something from which may be fired or projected a solid projectile, slug, pellet, missile or bullet . . . .. It must be something that is designed or manufactured to expel a projectile by action of an explosive.

    *     *     *     *     *     *

That is an essential element of the crime charged. The State must prove that element as well as other elements beyond a reasonable doubt . . . ..

    *     *     *     *     *     *

Once again, we are talking about a real gun capable of discharging a projectile of some sort, not talking about a toy gun, not talking about a water gun, not talking about a plastic gun that can't fire a projectile. We are talking about a real gun here. It is for you to determine on all this evidence that has been presented whether or not the State has satisfied its burden of proving to you beyond a reasonable doubt that Mr. Millett in the afternoon, as charged in Count I, had in his possession, * * * a pistol, revolver or other firearm as I have defined the term pistol and firearm for you which is capable of being concealed upon the person."

From these instructions it is clear that the case was tried and decided by the jury on the theory that, in order to find the defendant guilty of possession of a firearm by a felon as charged against him pursuant to 15 M.R.S.A., § 393, the State had the burden of proving beyond a reasonable doubt that the reference weapon was a real gun in operable condition. Thus, we will assume, without deciding the same, that 15 M.R.S.A., § 393 did require such proof.

In this case, Jessie Osborne, the State's principal witness, testified that he observed on the person of Bruce Millett at belt level the brown handle and hammer of a handgun sticking out of his clothing. Osborne professed to be experienced with firearms because of his ownership of rifles and pistols in the past and stated he was convinced the object he observed in the defendant's possession was an authentic handgun. Benito Conti who did not fancy himself having such experience with firearms thought the instrument projecting from Millett's belt could have been a 357 magnum pistol.

■ This evidence was sufficient to make a *prima facie* case for submission to the jury for their determination, whether the weapon in the possession of Millett was a real gun or an imitation one. From the whole evidence the jury was warranted to find beyond a reasonable doubt that on the afternoon of April 5, 1976 Millett actually had in his possession a real gun. It is not essential to the validity of such a finding that the firearm itself be admitted in evidence as an exhibit. *State v. Harwick*, 220 Kan. 572, 552 P.2d 987, 992 (1976); *Todd v. State*, 28 Md.App. 127, 343 A.2d 890, 893 (1975) (overruled on other ground); *United States v. Liles*, 432 F.2d 18 (9th Cir. 1970); *Coleman v. United States*, 219 A.2d 496 (D.C.App.1966).

■ Once the jury was satisfied beyond a reasonable doubt that the offending object was actually a firearm, it could equally conclude, in the absence of any evidence suggesting inoperability, that the weapon was operable. Mere allegation of inoperability is not sufficient to bar a conviction of unlawful possession of a firearm by a felon. Any real pistol or revolver would continue to qualify as a "firearm" until some evidence is presented in the case tending to establish the inoperability of the gun involved. The application of the inference of operability cannot be made to depend on the recovery of the weapon or its production in court. *State v. Cole*, 154 N.J.Super. 138, 381 A.2d 40, 44 (1977). In other words, proof that a convicted felon was in possession of a real firearm during the statutory prohibited period of time constitutes a prima facie violation of the Act and may sustain a conviction. See *State v. Lee*, 195 Neb. 348, 237 N.W.2d 880 (1976); *State v. Cartwright*, 246 Or. 120, 418 P.2d 822 (1966); *People v. DeFalco*, 176 Cal.App. 590,

1 Cal.Rptr. 578 (1960). The defense of inoperability will enter the case as an issue only if and when substantial evidence bearing on that issue is introduced, from whatever source such evidence may come. It is only when evidence is presented which will generate such an issue that the factfinder must determine, whether in light of the evidence of inoperability the State has sustained its burden of proof beyond a reasonable doubt of the defendant's guilt of possessing a firearm which was operable at the time contrary to the statute. *Commonwealth v. Lee,* 224 Pa.Super. 17, 302 A.2d 474 (1973); *State v. Morgan,* 121 N.J.Super. 217, 296 A.2d 539 (1972).

■ Here, the record is bare of any evidence of inoperability. In such posture of the case, the jury was warranted to find beyond a reasonable doubt that the defendant Millett was in possession of a firearm which was concealable upon his person within the meaning of 15 M.R.S.A., § 393.

### 3. *Order of joint trial*

Millett's final point of appeal involves the trial Justice's order at the State's request and over the defendant's objection that the firearm possession charges against Millett be tried with the armed assault brought against his codefendant James.[4] In arguing for a separate trial, Millett sought to convince the presiding Justice that his testifying might provoke a reprisal from James and, given such possible undesirable effect if he did take the stand, Millett indicated that he would be reluctant to be a witness in his own defense, if a joint trial were held. The Justice below, however, in granting the State's motion, ruled that separate trials would be inappropriate for the reason that the alleged offenses arose out of the same incidents and the same witnesses would be involved.

■ The propriety of consolidation for trial of separate bills of indictment against several defendants is to be determined by the same standard which this Court applies in cases where the point on appeal is, whether a requested severance of the trial of jointly charged defendants was properly denied. *State v. Coty,* Me., 229 A.2d 205 (1967). The decision of the trial court will not be reversed on appeal unless the appellant demonstrates a manifest abuse of discretion, which will depend upon the whole situation in each case. The appellant must make a clear showing of facts presented to the trial justice prior to trial which should have caused him to believe that the defenses of appellant and his codefendant were necessarily antagonistic or that he would be prejudiced by a joint trial. *State v. Niemszyk,* Me., 303 A.2d 105, 113 (1973), cert. denied 414 U.S. 1042, 94 S.Ct. 544, 38 L.Ed.2d 333; *State v. Coty,* supra; *State v. Bobb,* 138 Me. 242, 255, 25 A.2d 229, 236 (1942). See also *State v. Wing,* Me., 294 A.2d 418 (1972).

■ The record discloses that the matter of consolidation was taken up in chambers and that, as reported by the Court, certain representations were made to the presiding Justice:

"[T]here had been the suggestion of possible discussion or interference in the judicial process, the obstruction of justice by certain persons talking with State's witnesses and certain State's witnesses have indicated possible threats with respect to their forthcoming testimony and

---

4. Rule 13, M.R.Crim.P. provides that

"[t]he court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information."
Rule 8(b), M.R.Crim.P. furnishes the standard to be applied in implementing Rule 13. It states that

"[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

there has been some discussion some might raise the privilege of self-incrimination or change in testimony, different than (sic) what they demonstrated to the Prosecuting official."

Such bare suggestions of *possible* interference and *possible* threats with State's witnesses (neither defendant took the stand nor presented any witness) by persons unidentified, without the benefit of any recorded evidence, do not measure up to that clear showing that the defendants' positions at the time were necessarily antagonistic. Such an indefinite record does not permit us to test properly the question of abuse of discretion.

It is true that at trial counsel for James attempted to demonstrate in his cross-examination of the State's witnesses that Millett, rather than his client, might have fired the shotgun at Osborne in the early evening of April 5, 1976. The record does not indicate that, at the time of the hearing on the motion for consolidation, the Justice below was made aware of counsel's prospective trial strategy. Even if we should consider this aspect of the defendant's claim of prejudice under the obvious error-manifest injustice rule, the defendant's position has no merit. Bearing in mind that the trial Justice had instructed the jury that

> "[o]n the evidence in this case, I am instructing you—unless you find beyond a reasonable doubt that Mr. James discharged that firearm in an attempt to strike, hit, touch or do violence to another, you must find him not guilty. In other words, he is either guilty of an assault while armed with a firearm by virtue of his firing that gun at, I think, Jessie Osborne or other persons around, or nothing at all. There is no other charge against him. He is either guilty of an armed assault and that assault means the firing of that weapon, that firearm at a person, or he is not guilty,"

we believe it to be clear beyond dispute that the codefendant's trial strategy to pin the actual armed assault upon the defendant was thoroughly ineffective, since the defendant James was found guilty of that charge. Thus, the jury verdict completely refutes any possible harmful effect upon the defendant Millett.

Millett's further contention that the joint trial interfered with his right to testify in his own defense is not persuasive. The record discloses no evidence that the suggested threats to some prosecution witness were directed against Millett. The defendant's reference to the chilling atmosphere which confronted him in his upcoming decision to exercise his right personally to present testimony in his favor would seem to have been motivated by an apprehension that his previous manslaughter conviction would become admissible if he did testify, rather than any fear of his codefendant James as he claimed.[5] There was no abuse of discretion in granting the State's motion to consolidate.

The entry will be

Appeal denied.

Judgment affirmed.

---

5. Prior to trial, the presiding Justice made a tentative ruling that Millett's manslaughter conviction would in fact be admissible against him, if he chose to testify in his own defense.