2007 ME 122

**STATE of Maine**

v.

**Jeffrey RICE.**

Supreme Judicial Court of Maine.

Submitted On Briefs: June 13, 2007.

Decided: Aug. 28, 2007.

Stephanie Anderson, District Attorney, Julia A. Sheridan, Asst. Dist. Attorney, Portland, for plaintiff.

Sarah A. Churchill, Esq., Strike, Goodwin & O'Brien, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, SILVER, and MEAD, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, and SILVER, JJ.

Dissent: MEAD and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] Jeffrey Rice appeals from a judgment of conviction entered in the Superior Court (Cumberland County, *Crowley, J.*) for robbery (Class A), 17-A M.R.S. § 651(1)(B), (E) (2006); burglary (Class A), 17-A M.R.S. § 401(1)(B)(1) (2006); violation of conditions of release (Class E), 15 M.R.S. § 1092(1)(A) (2006); and criminal threatening (Class C), 17-A M.R.S. §§ 209(1), 1252(4) (2006). Rice argues that there was insufficient evidence that he used a firearm to support the enhancement of the robbery, burglary, and criminal threatening charges. He also asserts that there was insufficient evidence from which a jury could have found that he was the perpetrator of the crimes. We affirm the judgment.

## I. CASE HISTORY

[¶ 2] The trial produced the following evidence. In the late afternoon of Saturday, May 13, 2006, a young woman was working alone at the Bellingham Coffee Company, located on Warren Avenue in Portland. The Bellingham Coffee Company is a drive-up coffee shop, with no inside seating. Cars are visible as they enter from Warren Avenue. When drivers pull up to the speaker to order, the attendant's headset beeps to make her aware of the customer. When a customer orders at the speaker, the attendant cannot see the front of the car, but can see the rear part of the car if she looks out the back door.

[¶ 3] Around 4:45 P.M., on May 13, the young woman noticed a maroon, two-door Mercury pull up to the speaker to place an order. When the car pulled up to the window to pay, there was only one man in the car. He told the young woman that he did not have his wallet or any money, and that she should not make his coffee. He then asked her how late the shop was open and told her that he would return.

[¶ 4] At around 5:40 P.M., the man returned to the coffee shop. The young woman checked the clock when she saw the car pull up because it was close to closing time. After hearing the beep in her headset, the young woman stated, "good afternoon," and the customer responded, "hold on one second." She then heard the customer's car door shut and heard banging on the only door to the shop. The door, which is not accessible to the public, was locked. She saw a man banging at the door and tried to hide so he could not see her inside the shop.

[¶ 5] After a few moments, the banging stopped. The victim then saw a man climbing through the service window. It was the same man who had come to the window about an hour earlier and told her he could not pay for his coffee. When the man entered the shop, he pulled out a gun and pointed it at the victim. The victim was asked in both direct and cross-examination about "the gun," and she testified to the threatening manner in which the gun was displayed toward her. At one point, the gun was only six to eight inches from the victim's face and pointed directly at her.

[¶ 6] The victim was shaking and crying and asked the man if he was going to hurt her. He told her that he was having a really bad day, and that his son had just died. He then walked over to the cash register, which was open, and took out the money, except for the one-dollar bills and the change. He also took $200 from the deposit box inside a safe that was open.

[¶ 7] After he took the money, the man told the victim that he was going to leave and that she should not call the police for at least ten minutes. The man then left the shop, got back in his car, and drove off, taking a right down Warren Avenue.

[¶ 8] The victim first tried to call her boss and then called the police. The police arrived soon after the robbery.

[¶ 9] Portland Police Officer Jessica Brown responded to the call shortly after 5:40 P.M. The victim told Officer Brown that the man who robbed her was a white male, approximately 5′9″, thin, unshaven, smelling of cigarettes, wearing a green sweatshirt and blue jeans. She also stated that the man drove an older maroon, two-door Mercury.

[¶ 10] The victim testified that she was able to get a good look at the man and his car both times that he came to the shop. The victim could not describe the gun that the man was holding, except that it was black. She stated that because she was in shock and crying, she would not have been able to describe the man had the officer not asked her questions regarding specifics about what he looked like and what he was wearing.

[¶ 11] Portland Police Officer Terry Fitzgerald testified that he was on patrol on the afternoon of May 13, 2006. Around 5:15 P.M., Officer Fitzgerald initiated a traffic stop at the Park Street extension, after observing a car go through a red light at the intersection of State Street and York Street. When Officer Fitzgerald approached the car, the driver eventually identified himself as Jeffrey Rice. Rice was driving a red Mercury with the license plate 1349 NP.

[¶ 12] At the request of the State, Officer Fitzgerald timed the drive from the Park Street extension to the Bellingham Coffee Company. He testified that the drive took fifteen minutes. Rice hired a private investigator who also timed the drive from the Park Street extension to the Bellingham Coffee Company. He took a different route than Officer Fitzgerald, and the drive took him a little over seventeen minutes.

[¶ 13] Officer Richard Betters of the Portland Police Department testified that on May 7, 2006, he responded to a call at 182 Grant Street and came into contact with Rice. On May 14, 2006, Officer Betters heard a description of the suspect in the robbery of the Bellingham Coffee Company that had occurred the day before. After hearing the description of the suspect and his motor vehicle, Officer Betters thought of Rice because of his encounter with him a week earlier.

[¶ 14] Officer Richard Vogel of the Portland Police Department testified that he put together the photo lineup after learning about the robbery, Rice's traffic stop preceding the robbery, and after speaking with Officer Betters. The photo lineup included Rice. When Officer Vogel showed the victim the photo lineup two days after the robbery, she immediately pointed to Rice's picture and said, "that's him." He told her to take a look at the whole page again which she did. Again, she picked the picture of Rice.[1] The victim told Officer Vogel that Rice's hair was longer at the time of the robbery than it was in the photo. Officer Vogel also testified that Rice had a 1989 Mercury Cougar two-door registered in his name, license plate 1349 NP.

[¶ 15] Rice was arrested on Monday, May 15, after police stopped his vehicle. The police searched Rice's vehicle but did not find a gun. Rice was subsequently charged with robbery (Class A), 17–A M.R.S. § 651(1)(B), (E); burglary with a firearm (Class A), 17–A M.R.S. § 401(1)(B)(1); violation of conditions of release (Class E), 15 M.R.S. § 1092(1)(A); and criminal threatening with a dangerous weapon (Class C), 17–A M.R.S. §§ 209(1),

---

1. The victim also identified Rice in the courtroom as the man who had robbed the store.

1252(4). The robbery, burglary, and criminal threatening charges were aggravated because of the allegation of use of a firearm.

[¶ 16] Before trial, Rice pleaded guilty to an unrelated theft. Rice waived his right to a jury trial for Count 3, violation of conditions of release, because he did not want the jury to learn that he was on bail at the time of the robbery. The parties stipulated that Rice was on pre-conviction bail at the time of the criminal acts. Rice stipulated that if he was found guilty on Counts 1, 2, and 4, he would also be found guilty of Count 3.

[¶ 17] At trial, after the State rested, Rice moved, pursuant to M.R.Crim. P. 29(a), for a judgment of acquittal on the firearm enhancement based on the fact that the State's only evidence of the gun was the victim's testimony. Rice argued that in order to meet the statutory definition of a firearm, 17–A M.R.S. § 2(12–A) (2006), the State was required to present evidence that the weapon could be used to fire projectiles with the use of an explosive. The court denied the motion, noting that viewing the evidence in the light most favorable to the State, there was sufficient evidence for the jury to infer that the weapon displayed was a firearm. Rice renewed the motion at the close of the evidence.

[¶ 18] When instructing the jury on burglary and robbery, the court defined the term "firearm," pursuant to the definition in 17–A M.R.S. § 2(12–A), as follows: "a firearm means any weapon whether loaded or unloaded which is designed to expel a projectile by the action of an explosive and includes any such weapon commonly referred to as a pistol, revolver or gun." [2]

[¶ 19] The jury returned guilty verdicts against Rice on Counts 1, 2, and 4. The court found Rice guilty of Count 3. The court sentenced Rice as follows: Count 1 (robbery): twenty years, all but twelve years suspended, with four years of probation, and $1260 restitution; Count 2 (burglary) twenty years, all but twelve years suspended, with four years of probation, concurrent with Count 1; Count 3 (violating conditions of release): six months concurrent with Count 1; Count 4 (criminal threatening with a dangerous weapon): five years concurrent with Count 1; and Count 5 (the unrelated theft by unauthorized taking or transfer): six months concurrent with Count 1. This appeal followed.

## II. LEGAL ANALYSIS

[¶ 20] A firearm is "any weapon, whether loaded or unloaded, which is designed to expel a projectile by the action of an explosive and includes any such weapon commonly referred to as a pistol, revolver, rifle, gun, machine gun or shotgun." 17–A M.R.S. § 2(12–A).

◼ [¶ 21] Rice argues that there was insufficient evidence in the record to support a finding that Rice used a firearm, as defined by the statute, when committing the offenses. Therefore, Rice asserts that the firearm factor, aggravating the classification of the robbery, burglary, and criminal threatening charges, was unproven. The State contends that it was not required to produce evidence of "the inner workings of the firearm" to support the convictions.

◼ [¶ 22] We review a denial of a motion for a judgment of acquittal by using a sufficiency of the evidence analysis. *State v. Kotredes*, 2003 ME 142, ¶ 9, 838 A.2d

---

**2.** The court stated that it was not going to repeat the definition of firearm again for purpose of the criminal threatening charge.

331, 335. Therefore, we "view the evidence in the light most favorable to the State to see if any fact-finder could rationally find every element of [each] offense beyond a reasonable doubt." *Id.*

[¶ 23] A firearm or a gun is something that people can identify from their common experience. The victim testified that Rice pointed a gun at her, and that, at one point, the gun was displayed within six to eight inches of her face. The evidence also indicates that Rice used and displayed the gun to threaten the victim, and that the manner in which he used the weapon supports the conclusion that Rice believed he was using a firearm, not some other object that would not have enhanced the seriousness of Rice's crimes.

■ [¶ 24] The State is not required to produce the firearm used in a crime at trial to prove that the defendant committed a crime with the use of a firearm. *State v. Millett,* 392 A.2d 521, 527–28 (Me. 1978). Nor does the State have to prove that the firearm was operable, absent evidence of inoperability. *Id. See also United States v. Dobbs,* 449 F.3d 904, 910–11 (8th Cir.2006). *Dobbs* involved the robbery of a convenience store. *Id.* at 906. Like the instant case, the firearm used to commit the robbery was not part of the evidence. *Id.* at 908, 910. The defendant argued that failure to produce the firearm barred conviction on the firearm charge because "a lay person such as the eyewitness store clerk is not competent to testify as to whether a particular object meets the statutory definition of a 'firearm.'" *Id.* at 910. The *Dobbs* court rejected the defendant's argument noting that "they offer no cases in support of these propositions." *Id.* The

court went on to hold that "numerous courts have held that, without a firearm in evidence and without expert opinions based on analysis of the firearm, lay testimony from eyewitnesses can be sufficient to support a finding that an object is, in fact, a firearm." *Id.* at 910–11 (citing *United States v. Kirvan,* 997 F.2d 963, 966 (1st Cir.1993) (collecting cases)).[3]

[¶ 25] The *Dobbs* court noted that evidence supporting the finding that the firearm was used in the robbery included the store clerk's testimony that she had seen a firearm and evidence that one of the defendants "handled the object as though it were a firearm." *Id.* at 911. The evidence in *Dobbs* also included a security videotape of portions of the robbery in which one defendant handled an object that appeared to be a firearm. *Id.*

[¶ 26] Eyewitness observations and circumstantial evidence have also supported findings of use of a firearm, without the firearm being introduced into evidence, in Maine practice. In *State v. Millett,* the defendant was charged with two counts of being in possession of a firearm. 392 A.2d at 522. After he was convicted, two of his arguments on appeal were that the State failed to prove that the instrument he had in possession was a firearm and failed to prove that it was a firearm, "in operable condition, i.e. capable of firing a projectile." *Id.* The evidence revealed that the defendant had displayed a gun visible to several people while a codefendant made threatening remarks and, on a later occasion, the codefendant had shot a different gun in their direction, causing some leaves and dirt to fly in the air. *Id.* at 523. One of the witnesses also expressed familiarity

---

**3.** Like Maine's statute, the United States Code's definition of a "firearm" includes characteristics of its "inner workings." 18 U.S.C.S. § 921(a)(3) (LexisNexis 2006). "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.*

with guns and was convinced that the defendant had displayed an authentic handgun. *Id.* at 527.

[¶ 27] In *Millett,* we stated that we would assume, without deciding, that the possession statute required the State to prove beyond a reasonable doubt that the reference weapon was a gun in operable condition. *Id.* at 527. Based on the evidence about the gun from the witnesses and the fact that there was no evidence that the gun was inoperable, we determined that there was sufficient evidence to support the defendant's convictions for possession of a firearm. *Id.* at 527–28.

[¶ 28] In *State v. Nile,* 557 A.2d 950, 951 (Me.1989), the defendant was charged with, inter alia, kidnapping with a dangerous weapon, criminal threatening with a firearm, and possession of a firearm by a felon. The defendant had kidnapped and raped his estranged wife. *Id.* The rifle used by the defendant during the criminal conduct was not introduced into evidence. *Id.* at 952. After he was convicted, the defendant argued on appeal that the State had not provided sufficient evidence of the "firearm" to support his conviction for the charges. *Id.* at 951–52. We held that the evidence that the rifle was one of many guns owned by the defendant, that he loaded it with ammunition, and pointed it at the victim, was sufficient to support the charges. *Id.* at 952.

[¶ 29] Here, the evidence that Rice used a firearm to commit the robbery, burglary, and criminal threatening included the victim's testimony that Rice pulled out a black gun, pointed it at her, and threatened her. The evidence also included the victim's description that Rice handled the object as though it was a firearm. *See Dobbs,* 449 F.3d at 911. Although the State offered more evidence in *Millett* and *Nile* to support a finding that a firearm was used by the defendant, the victim's testimony in this case is sufficient to support the convictions. As we stated in *Millett,* the State was not required to produce the gun or to prove that it was operable, absent any evidence of inoperability. 392 A.2d at 527–28. Federal precedent indicates that a firearm is such a familiar object in today's society that one could be sufficiently identified by an eyewitness. *Dobbs,* 449 F.3d at 910–11. Therefore, the victim's testimony was sufficient to establish Rice's use of the firearm. The trial court did not err in denying Rice's motion for judgment of acquittal on the firearm enhancement of the charges against him.

[¶ 30] Rice also argues that there was insufficient evidence to support the guilty verdicts against him as the perpetrator of the crimes. In reviewing a challenge to the sufficiency of the evidence, we review the facts in the light most favorable to the State "to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged." *State v. York,* 2006 ME 65, ¶ 7, 899 A.2d 780, 782. "Determinations regarding witness credibility are in the exclusive province of the factfinder." *State v. Durant,* 2004 ME 136, ¶ 12, 861 A.2d 637, 640. A conviction may be based on circumstantial evidence "and is not for that reason less conclusive." *State v. Ardolino,* 1997 ME 141, ¶ 20, 697 A.2d 73, 80 (citing *State v. Benner,* 654 A.2d 435, 437 (Me.1995)). Furthermore, the fact-finder is allowed to draw all reasonable inferences from the circumstantial evidence. *Id.* The evidence in the record, discussed above, is sufficient to support Rice's convictions on all four charges.

The entry is:

Judgment affirmed.

MEAD, J., with whom CALKINS, J., joins, dissenting.

[¶ 31] In prosecutions where the State pleads and proves that a crime was com-

mitted with the use of a dangerous weapon, the sentencing classification of that offense is increased by one sentencing class. 17–A M.R.S. § 1252(4) (2006). The statute thus makes the existence of an actual dangerous weapon an element of the enhanced criminal charge that must be proved beyond a reasonable doubt. By affirming the judgments of conviction, the Court concludes that the unadorned testimony of the victim stating that Rice displayed what she thought to be a gun was sufficient to sustain the State's burden of proof.[4] I cannot agree, and therefore, I respectfully dissent.

[¶ 32] Citizens of this State are well served by laws that deter the use of firearms in the commission of crimes. The fact that a perpetrator of a crime employs a firearm in the course of the offense immediately and substantially increases the danger of his actions. The enhanced sentencing classifications appropriately reflect the increased danger presented by those who use a firearm in the commission of an unlawful act.[5]

[¶ 33] Pursuant to Maine law, a dangerous weapon includes "a firearm or any other weapon, device, instrument, material or substance ... capable of producing death or serious bodily injury." 17–A M.R.S. § 2(9)(A) (2006). A firearm is "any weapon, whether loaded or unloaded, which is designed to expel a projectile by the action of an explosive and includes any such weapon commonly referred to as a pistol, revolver, rifle, gun, machine gun or shotgun." 17–A M.R.S. § 2(12–A) (2006). The statutory definition of a "firearm" does not include toy guns, or paintball or pellet guns (which expel paint or metal pellets by use of compressed air).

[¶ 34] It may be compellingly argued that the use of a toy gun or other similar device, having the appearance of a firearm, also enhances the danger created by the commission of a crime. A particularly dangerous situation is created when the use of a toy firearm occasions the defensive use of deadly force, including actual firearms, by law enforcement officers or armed civilian bystanders. However, the Legislature has expressly not addressed this situation. By limiting the enhancement provisions to the use of dangerous weapons (which includes only authentic firearms by statutory definition), the Legislature has not brought toy or imitation firearms within the scope of the statute.[6] An amendment to the Maine Criminal Code bringing the threatening display of realistic firearm toys within the scope of the dangerous weapons statute would resolve the issue.

---

4. Rice was convicted of three offenses that were subject to sentence enhancements based upon the use of a firearm. The statutes defining the offenses invoke the firearm enhancement in different manners. The robbery statute, 17–A M.R.S. § 651(1)(B), (E) (2006), enhances the sentencing class if "[t]he actor is armed with a dangerous weapon in the course of a robbery ...." The burglary statute, 17–A § 401(1)(B)(1) (2006), enhances the sentencing class if "[t]he person is armed with a firearm ...." The criminal threatening statute, 17–A M.R.S. § 209(1) (2006), contains no internal references to firearms, but is enhanced by the "use of a dangerous weapon" provisions of 17–A M.R.S. § 1252(4) (2006).

5. Mandatory minimum sentences are also imposed where a firearm is used against a person in the commission of certain crimes. *See* 17–A M.R.S. § 1252(5) (2006).

6. In contrast, the use of a toy gun satisfies, in certain federal offenses, the element of a crime that requires the use of a dangerous weapon. *See, e.g.,* 18 U.S.C.S. § 2113(d) (2005); *United States v. Martinez–Jimenez,* 864 F.2d 664, 667 (9th Cir.1989). However, the definition of a firearm under federal law does not include a toy gun. 18 U.S.C.S. § 921(a)(3)(A) (2005); *see also United States v. Dobbs,* 449 F.3d 904, 910 (8th Cir.2006).

[¶ 35] It is apparent from the victim's testimony that she had but a brief opportunity to observe the gun under stressful circumstances:

Q. And is it also fair to say that was probably the most scared you have ever been?

A. Yes, it is.

. . . .

Q. Do you remember where the man pulled the gun out of?

A. His jacket.

. . . .

Q. Okay. And I think you testified and told [the prosecutor] that when the gun was pointed at you, it was pretty close to your face, right?

A. Yes.

Q. And can you describe the gun at all for us?

A. I don't know much about guns. I just know that it was black.

Q. Okay. And in comparison to the size of the hand it was in, was it bigger than the man's hand or was it smaller than the man's hand?

A. I honestly don't remember.

Q. Can you describe at all the hands of the man that was holding it?

A. No.

Q. Fair to say that you were pretty much just kind of looking at the end of the gun pointed at you?

A. Yeah, I mean I was trying to focus on something else. I wasn't staring—you know, I was shaking and stuff.

Q. Were you crying at that point?

A. Yes.

Q. How long after this incident started did you start crying?

A. I started crying when he came over to me at first and I was still crying after.

. . . .

[¶ 36] The victim further testified the total length of the incident, including the period when the perpetrator put down the gun and emptied the shop's cash tills, was "probably like two [minutes]. I don't really know." The police never recovered any firearm of any kind. As a result, the State's evidence of whether the instrument brandished by the perpetrator was, in fact, a firearm as defined by law is limited to the four corners of the victim's testimony as noted above.

[¶ 37] The visual identification of an actual firearm, as opposed to a realistic toy, is complicated by the fact that numerous identical copies are available in the consumer market. Paintball, pellet and BB guns, as well as other similar "toys" are manufactured to resemble actual, specific firearms. Critics have decried this practice.

> Paramilitary enthusiasm has not been limited to the firearms market. America's manufacturers of non-powder firearms (such as BB guns and pellet guns) and toy guns have been quick to realize that assault weaponry is in. These manufacturers' role models are no longer hunting rifles and Western-style six-shooters, but machine guns and large-caliber handguns. This shift has been accompanied by a keener eye to detail and advances in plastic molding. The result: non-powder firearms and toy guns that are virtually indistinguishable from their more lethal counterparts.

Josh Sugarmann, *Assault Weapons and Accessories in America*, Violence Policy Center, 1988, http://www.vpc.org/studies/awalook.htm. Non-experts face a nearly impossible task in distinguishing actual, lethal firearms from virtually identical toy knock-offs. *See* Joe Wojtas, *Real Crimes, Unreal Weapons*, N.Y. TIMES, Apr. 8, 2007, at 14NJ3.

[¶ 38] The law in Maine provides that it is not necessary for the State to offer the firearm at trial to prove that an actual firearm was used in the commission of the

crime. *State v. Nile,* 557 A.2d 950, 952 (Me.1989); *State v. Millett,* 392 A.2d 521, 527 (Me.1978); *United States v. Dobbs,* 449 F.3d 904, 910–11 (8th Cir.2006). If the evidence is sufficient for the jury to reasonably draw an inference, beyond a reasonable doubt, that the weapon was a firearm, that finding will be upheld on appeal. *Nile,* 557 A.2d at 952; *Millett,* 392 A.2d at 528. However, in every instance cited by the Court in which an appellate court upheld such an inferred finding, the prosecution offered a significantly greater quantum of evidence than the unadorned testimony of a single victim, lacking any familiarity with firearms, as found in this case.

[¶ 39] In *Millett,* the State's principal witness, who had significant experience with firearms due to his past ownership of rifles and pistols, testified that he believed the weapon in dispute was an authentic firearm. 392 A.2d at 527. The State also provided a second witness who testified that the weapon could have been a .357 magnum handgun. *Id.* In *Nile,* the defendant took a gun from his own gun case located in his home, loaded it in the presence of his wife, and used it in the commission of the various crimes against her. 557 A.2d at 951–52. In *Dobbs,* the First Circuit provided:

> Here, the store clerk testified that she was very certain that the object was a firearm. The tape showed an object consistent with a firearm. The clerk heard the gun click when Wilson chambered a round, and the click is audible on the tape. An officer testified that the sound on the tape is the sound of a round being chambered. Wilson handled the object as though it were a firearm, and Kristiana Roth testified that Dobbs had bragged about a gun prior to the robbery. In short, notwithstanding the fact that the ATF expert could not conclude that the object was a firearm based on the videotape, the rec-

ord as a whole is sufficient to support the jury's finding that the defendants used a firearm.

*Dobbs,* 449 F.3d at 911. The *Dobbs* decision cites *United States v. Kirvan,* 997 F.2d 963, 966 (1st Cir.1993) as collecting citations to cases which hold that lay witness testimony can rationally support a finding that a brandished weapon was a firearm. *Dobbs,* 449 F.3d at 911.

[¶ 40] *Kirvan* involved the corroborating testimony of two witnesses who identified the object brandished as a gun with a five-inch barrel. 997 F.2d at 966. The surface was metallic, and when the object was dropped, it made a loud noise. *Id.* The First Circuit affirmed the jury's finding and vacated the trial court's judgment of acquittal, finding that the weight of the object, as exhibited when it was dropped to the floor, confirmed that it was unlikely to be a toy. *Id.* at 966–67. The First Circuit cited other cases where non-expert testimony supported a similar finding of a firearm. *Id.* at 966 (citing *Parker v. United States,* 801 F.2d 1382 (D.C.Cir.1986); *United States v. Jones,* 907 F.2d 456 (4th Cir.1990)). However, none of these cases rested upon the lay testimony of a single, inexperienced witness expressing an opinion that the weapon was a firearm. *Parker,* 801 F.2d at 1385 (testimony of two witnesses sufficient for a jury to reasonably find that object used in the commission of a crime was a firearm); *Jones,* 907 F.2d at 460 (testimony of five witnesses sufficient for a jury to reasonably find that object used in commission of a crime was a firearm). In fact, the First Circuit expressly declined to decide such a question, providing "[w]e need not decide here whether the government's burden could be met merely by unembellished *lay testimony* that 'the robber carried a gun.'" *Kirvan,* 997 F.2d at 966 (emphasis added). The First Circuit sustained the factual finding of a firearm, but expressly re-

served comment of "whether less [evidence] would do." *Id.*

[¶ 41] By its ruling today, the Court sits alone at the very outskirts of this jurisprudence. Given the widespread proliferation of visually indistinguishable toy weaponry, I cannot conclude that the testimony of this single lay witness, based upon a brief and harrowing encounter, is sufficient to meet the State's burden that the object brandished was in fact a firearm as defined by law. Maine law requires more. Accordingly, I dissent and would vacate the judgment of the trial court to the extent that the sentencing classifications have been enhanced and remand for entry of judgment and sentencing upon unenhanced convictions.