# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-2249

_____

United States of America,        *
        *
        Plaintiff - Appellee,     *
        *
     v.        *
        *
Kasper Lamar Dobbs,      *
        *
        Defendant - Appellant.   *

_____

No. 05-2973

_____

Appeals from the United States
District Court for the Northern
District of Iowa.

United States of America,        *
        *
        Plaintiff - Appellee,     *
        *
   v.        *
        *
Robert Wilson, Jr.,       *
        *
        Defendant - Appellant.   *

_____

Submitted: February 16, 2006
Filed: May 31, 2006

_____

Before BYE, HEANEY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Kasper Dobbs and Robert Wilson appeal their federal convictions and sentences stemming from the armed robbery of $565 from a "mom and pop" convenience store in Dubuque, Iowa. A jury convicted the defendants of Interference with Commerce by Violence (robbery) under the Hobbs Act, 18 U.S.C. § 1951(a), and firearms violations under 18 U.S.C. §§ 922 and 924. In addition, the district court found that Wilson had a sufficient number of prior convictions for "serious violent felonies" to mandate a life sentence under 18 U.S.C. § 3559. The district court sentenced Dobbs to 444 months imprisonment. Dobbs's sentence was the minimum Guidelines sentence under the applicable range of 360 months to life with a mandatory consecutive eighty-four-month sentence for the firearms charges.

As to Wilson, we affirm the judgment of conviction but find the enhancement under § 3559 inapplicable, vacate his sentence, and remand for resentencing. As to Dobbs, we affirm.

I.

We review the evidence in a light most favorable to the verdicts, drawing all reasonable inferences in favor of the prosecution. A central piece of evidence in this case was a May 22, 2003 videotape[1] from a surveillance camera at the convenience store that shows two men robbing the store. As explained below, numerous witnesses acquainted with Dobbs and Wilson identified them as the men visible on the tape. Also, although Dobbs is Wilson's half-brother and admits that he was present in the

_____

[1]The date displayed on the videotape of the May 22, 2003 robbery was not May 22. However, the store clerk shown in the tape authenticated the tape, and there is no challenge to the fact that the videotape accurately depicts the May 22 robbery.

store (claiming that he "went in, got something, went back outside, went back in"), Dobbs claims that he was an innocent bystander uninvolved with the robbery.

The surveillance camera was located behind and above the counter, and the counter was located near the front door. The view shown on the tape includes the counter, the cash register, a portion of the space behind the counter, the area at the counter where a customer would stand when paying for a product, the front door, and a section of the store containing coolers and racks of merchandise. The videotape shows that Dobbs entered the convenience store, stood in line as another customer completed a purchase, purchased a can of beer, and left. During this trip into the store, Dobbs did not cover his face, and he stood facing the camera for a substantial period of time.

Shortly after leaving the store, Dobbs re-entered and asked the clerk for cigarettes. When the clerk was distracted retrieving cigarettes, Wilson entered the store with his hands in his pockets, walked behind the counter, and withdrew his hands and an object from his pockets. In the tape the object appears to be a firearm. Wilson pulled back on the top of the firearm in a motion that resembled the chambering of a round, and the firearm made a clicking sound. He then pointed the firearm at the clerk, ordered the clerk to the floor, and emptied the cash register. Throughout the robbery, Wilson repeatedly commanded the clerk to lie on her stomach.

During most of the robbery, Dobbs faced the camera but held his hands generally in front of his face in an apparent attempt to act like an innocent bystander or hide his face. After Wilson emptied the cash register and began to walk around from behind the counter, however, Dobbs lowered his hands and used gestures to instruct Wilson to return behind the counter and check the clerk. Wilson did so. While leaving the area behind the counter for the second time, Wilson looked directly

into the security camera from close range.  Wilson and Dobbs then left the store together.

The government's case also included the in-court testimony of numerous witnesses who, prior to trial, identified Wilson and Dobbs as the men on the videotape.  Kristiana Roth, who had been Dobbs's live-in girlfriend for about two weeks at the time of the robbery, identified Dobbs as the first man to enter the store and Wilson as the man with the firearm.  She recognized the men's clothes in the videotape as the same clothes that Dobbs and Wilson had been wearing when they left Dobbs's residence shortly before the robbery and when they returned to the residence shortly after the robbery.  She also stated that when Dobbs and Wilson returned to the residence on the night of the robbery, they had money, acted nervous, talked about leaving town, and told her to stay in a different room.  Finally, she stated that she had never seen Dobbs or Wilson with a gun but that Dobbs previously had bragged about a gun.

Stacy Rhone, the mother of two of Dobbs's children, identified Dobbs as the first man on the tape and Wilson as the man with the firearm.  She also testified that she had known both men for twenty years. A third witness, Kathy Kennedy, identified Wilson as the man with the firearm on the tape.  Prosecutors asked her at trial if she knew a different man that the police had initially arrested, if she knew Dobbs, and if the two men looked similar.  She responded that she knew Dobbs and the other man, they looked alike, but "if you know one of them well enough, you would know the difference."

The store clerk testified as an eye-witness to the robbery.  She stated that the object the second man pulled from his pocket was a silver firearm, she had a good view of the object because it was pointed directly at her, and the object made a clicking noise like a firearm.  Her only prior experience with firearms was her observation of police officers' weapons during her own prior arrests and encounters

-4-

with law enforcement. She claimed to have gotten a good look at the second man, his eyes in particular, but could not identify Wilson from an array of photos. She was able to narrow the field of photos down to Wilson and one other person, but she selected the photo of the other person. The person whose photo she selected was not the person that the police had initially arrested. The prosecutors did not ask her to identify the defendants at trial.

Other witnesses testified about the interstate nature of the store's business. A representative from a wholesale supplier for the store testified that most of the products his company sold to the store were produced outside of Iowa. The supplier's warehouse, however, was located in Iowa. A beverage supplier's representative testified that the products his company supplied to the store were produced in Wisconsin. The store owners' son, an employee of the store, testified that the store sold a variety of goods and rented and sold movies. Movie rental records showed that many of the store's customers were from outside Iowa. It is undisputed that the store is a stand-alone store and not part of a larger chain. Relevant to the issue of the interstate nature of the store is the fact that Dubuque is located at the tri-state border of Iowa, Illinois, and Wisconsin. The owners' son testified that the store is about seventeen blocks from the border and that, although the store is not located on an interstate highway, the store is located in an area of Dubuque frequented by tourists. He also stated that Dubuque is a confusing town such that many people from out-of-town stop at the store to ask for directions. The store has not sold gasoline since the 1980s.

Finally, an ATF firearms expert for the prosecution testified as to the issue of whether the firearm had traveled in interstate commerce. He stated that he was unaware of any firearms manufacturers in the state of Iowa, other than custom manufacturers of collectible long guns, and, therefore, if the object Wilson brandished during the robbery was a firearm, it had to have arrived in Iowa by crossing state lines. Based on the tape, he characterized the object as black rather than silver. He also

stated that, based on the tape and without examining the object, he could not tell if the object was firearm or a non-functional replica.

Before trial, both defendants moved unsuccessfully to suppress the out-of-court identification evidence. After trial, both defendants moved unsuccessfully for acquittal. Also, Dobbs moved repeatedly to have a different attorney appointed. An assistant federal public defender initially represented Dobbs. She had to withdraw from the case for reasons unrelated to Dobbs, and the court appointed a replacement attorney. Dobbs had complained about the representation provided by the federal public defender and later complained about replacement counsel. In particular, he complained that replacement counsel did not use an investigator and would not file various motions that Dobbs wanted filed. Ultimately, Dobbs filed a lawsuit against replacement counsel in state court. Replacement counsel requested to be removed from the case due to an inability to work with Dobbs, but the district court denied the request. The court found that Dobbs was being obstreperous and that the state court action and requested motion filings were frivolous and therefore not fatal to effective representation. Finally, the court stated that even if it were to replace the replacement counsel, the same difficulties in working with Dobbs would simply be imposed on a different appointed attorney. Notwithstanding the complaints, state court lawsuit, and difficult behavior, Dobbs stated to the court following trial that he was pleased with the representation he received from replacement counsel.[2]

---

[2]Although Dobbs now challenges the district court's refusal to appoint a second replacement attorney, we reject the challenge based on Dobbs's admission of satisfaction with trial counsel's performance and Dobbs's failure to identify any prejudicial actions or omissions by trial counsel. Dobbs complains primarily about counsel's failure to use an investigator. In response to this complaint, we note that the federal defender used an investigator early in the case. We note also that multiple supplemental pro se filings in this case demonstrate that Dobbs desired further use of investigators largely to conduct a fishing expedition rather than to explore legitimate avenues of inquiry.

II.

Dobbs argues that the evidence against him was insufficient to support his conviction. In particular, he argues that the evidence was insufficient to prove beyond a reasonable doubt his identity as one of the robbers, the presence of a firearm, his use of a firearm, or the requisite nexus to interstate commerce. Dobbs also argues that the district court abused its discretion by denying his request for the appointment of a second replacement attorney and denying his first replacement attorney's request to withdraw.

Similarly, Wilson argues that the evidence was insufficient to prove beyond a reasonable doubt his identity as one of the robbers, the presence of a firearm, or interference with interstate commerce as required to make the robbery a federal crime under the Hobbs Act. Wilson also argues that the district court erred by allowing witnesses to testify regarding out-of-court identifications. Finally, Wilson presents four separate challenges to his sentence. First, he argues that he does not have two prior "serious violent felonies" under 18 U.S.C. § 3559. Second, he argues that he does not have three prior "violent felonies" under the Armed Career Criminal Act, 18 U.S.C. § 924(e). Third, he argues that his life sentence is unconstitutional under the Eighth Amendment. Finally, he argues that the district court erred in applying a two-level enhancement for reckless endangerment during flight.[3]

A. Admission of Identification Evidence

As to the admission of out-of-court identifications by three witnesses, Katherine Kennedy, Stacy Rhone, and Kristiana Roth, the defendants argue that the

---

[3]Wilson's arguments against application of the Armed Career Criminal Act and the two level enhancement for reckless endangerment are without merit and we do not address them further. Because we find § 3559 inapplicable, we do not address Wilson's Eighth Amendment argument.

methodology involved in the identification process was impermissibly suggestive. In particular, the defendants take issue with the fact that investigators informed the witnesses that Wilson and Dobbs were suspects before asking the witnesses to view still photographs of the men. The argument that this type of pre-identification information sharing is impermissible is based on cases that limit the use of suggestive techniques when presenting line-ups or photo arrays to eyewitnesses. See, e.g., Simmons v. United States, 390 U.S. 377, 383-85 (1968) (discussing limitations on suggestive identification techniques in the context of identifications by in-person eyewitnesses to a bank robbery); United States v. Williams, 340 F.3d 563, 566-67 (8th Cir. 2003) (finding that the use of a single photograph of a defendant from a prior arrest with no accompanying photographs of other persons was impermissibly suggestive where the witness viewing the photographs was an eyewitness to a controlled buy who had seen the defendant in person only one time); United States v. Patterson, 20 F.3d 801, 806 (8th Cir. 1994) (finding that it was improper to use single photograph displays with eyewitnesses). In the present case, this argument is misplaced. The women who identified Wilson and/or Dobbs on the tape were not eyewitnesses being asked to recall their impression of a stranger during a short encounter in the emotionally charged context of an armed robbery. Rather, the three women who testified were individuals already acquainted with Dobbs and Wilson. When an eyewitness is shown an improper lineup or photo array, undue suggestiveness may be prejudicial because the suggestiveness may cause the eyewitness to falsely recollect the face of the person who committed the offense.[4] In

---

[4]In Simmons, the Supreme Court described the concerns present in cases of eyewitness identification:

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom

-8-

contrast, when someone already familiar with a suspect is asked to comment on whether a recorded voice or image portrays the suspect, these concerns are absent. In general, a girlfriend, relative, or other acquaintance is better equipped than a juror to determine if an image on a tape is, in fact, the image of the known person. This superior ability makes such a witness, if deemed credible, a valuable aid to the jury.

### B. Sufficiency of the Evidence: Identification of the Defendants

Because admission of the identification evidence was not erroneous, we consider this testimony along with the videotape, admissions, and the other evidence to gauge the sufficiency of the evidence to support the convictions. Although the tape was not outstanding in quality, we believe that the tape was of sufficient quality to substantially aid the jury in the identification of the defendants, both of whom were present in the courtroom during the trial. Buttressed with the testimony of the identification witnesses and with Dobbs's admission, the evidence clearly is sufficient. We note in particular that Dobbs's claim that he was an innocent bystander is almost nonsensical. The jury would have had to ignore his clear gestures towards his half-brother during the robbery as shown on the tape to accept his argument.

> they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons, 390 U.S. at 383-84 (footnotes omitted).

C. Sufficiency of the Evidence: Use of a Firearm

The defendants argue correctly that a firearm is "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive[.]" 18 U.S.C. § 921(a)(3)(A). They argue incorrectly, however, that is impossible to prove that an object satisfies this definition without conducting a physical examination of the object. They also argue that a lay person such as the eyewitness store clerk is not competent to testify as to whether a particular object meets the statutory definition of a "firearm." They offer no cases in support of these propositions. In contrast, numerous courts have held that, without a firearm in evidence and without expert opinions based on analysis of the firearm, lay testimony from eyewitnesses can be sufficient to support a finding that an object is, in fact, a firearm under § 921(a)(3)(A). See, e.g., United States v. Kirvan, 997 F.2d 963, 966 (1st Cir. 1993) (collecting cases).

The defendants also argue that because the store clerk called the object silver and the ATF agent stated that the video showed a black object, there is uncertainty as to the reliability of the store clerk's testimony. It is not clear that the two witnesses' different characterizations of the color of the gun create a discrepancy. Kirvan, 997 F.2d at 966-67 ("One witness could easily describe gun metal as black and another as silver."). Further, even if the different witnesses' color descriptions did constitute a discrepancy, the jury rather than this court is the body to resolve that discrepancy and factor it into a credibility assessment based on the entirety of the evidence. Here, the store clerk testified that she was very certain that the object was a firearm. The tape showed an object consistent with a firearm. The clerk heard the gun click when Wilson chambered a round, and the click is audible on the tape. An officer testified that the sound on the tape is the sound of round being chambered. Wilson handled the object as though it were a firearm, and Kristiana Roth testified that Dobbs had bragged about a gun prior to the robbery. In short, notwithstanding the fact that the ATF expert could not conclude that the object was a firearm based on the videotape,

the record as a whole is sufficient to support the jury's finding that the defendants used a firearm.

### D. Interstate Commerce: the Firearm

As to the question of whether the firearm traveled in interstate commerce, the testimony of the ATF agent that only rare, collectible guns are manufactured in Iowa suffices to prove that, if the object was a firearm, it was a firearm that had traveled in interstate commerce. See United States v. Cox, 942 F.2d 1282, 1286 (8th Cir. 1991) ("The government need not produce the firearm in question to satisfy this element; proof that the firearm was manufactured outside the state of possession will suffice.").

### E. Interstate Commerce: the Hobbs Act Robbery

We are bound by Eighth Circuit precedent to hold that the present robbery "interfered with interstate commerce" as required to elevate the crime from a state offense to a federal offense under the Hobbs Act. In United States v. Farmer, 73 F.3d 836, 843-44 (8th Cir. 1996), we held that an attempted armed robbery of a store belonging to a large interstate chain of stores comprised a Hobbs Act violation. There we stated, "We have no doubt of the power of Congress to protect from violence businesses that are part of an interstate chain." Id. at 843. In that case, we distinguished United States v. Lopez, 514 U.S. 549 (1995), in which the Supreme Court relied on the Commerce Clause to invalidate a statute that prohibited the possession of a firearm near a school. We stated, "We think [Lopez] has no application to cases of commercial establishments, such as the [interstate chain] store involved here." Farmer, 73 F.3d at 843.

Later in United States v. Vong, 171 F.3d 648, 654 (8th Cir. 1999), we held that the robberies of several Twin Cities area jewelry stores interfered with interstate commerce under the Hobbs Act because the stores, "bought and resold jewelry that

was manufactured, in part, outside the State of Minnesota and shipped to the stores using interstate transportation channels." Id. In Vong, we emphasized the statement from Farmer that "Lopez does not apply to cases involving commercial establishments." Id. We further distinguished Lopez by noting the fact that the firearms statute in Lopez had "no express jurisdictional nexus to interstate commerce," id., whereas the Hobbs Act has an express nexus that requires the robbery to "affect commerce." Id.

Finally, in United States v. Williams, 308 F.3d 833, 838-40 (8th Cir. 2002), we upheld a Hobbs Act conviction for the armed robbery of a Cedar Rapids, Iowa, taxicab driver. In Williams, the evidence showed that the cab was locally owned by an individual and driven by another man. The individual cab owner paid for the use of a logo and dispatch service and bought insurance from an out-of-state company. The driver was responsible for the expenses of operation and had an interest in the fares. As noted therein, the cab "frequently transported Federal Express employees, railroad crew members, and packages that were moving in interstate commerce. [The cab driver] also regularly transported passengers to and from the Eastern Iowa Airport. The robbery forced the cab to be shut down during the time when lucrative trips to the airport were likely to occur." Id. at 836. The actual issue we decided in Williams was whether it was harmless error to instruct the jury that the effect on interstate commerce "may be merely probable or potential, not an actual effect." Id. at 837. We stated that the instruction was erroneous, because an actual rather than probable effect is required. We held, however, that the error was harmless because "the substantial weight of the evidence supports the conclusion that there was an effect on interstate commerce." Id. at 838.

These three cases show that a commercial victim in a robbery need not be a large, interstate chain, as in Farmer, to trigger application of the Hobbs Act. Rather, as in Vong and Williams, robberies from small commercial establishments qualify as Hobbs Act violations so long as the commercial establishments deal in goods that

move through interstate commerce. The defendants nevertheless argue that the present robbery of the stand-alone, "mom and pop" convenience store had only a de minimis connection to interstate commerce such that it should not be a federal crime. See United States v. Morrison, 529 U.S. 598, 612-13 (2000) (stating that one factor to consider in determining whether an activity substantially affects interstate commerce is whether the connection between the activity and an effect on interstate commerce is too attenuated to permit federal regulation). We have recognized, however, that a statute with an express jurisdictional nexus to interstate commerce may be applied in circumstances where the actual connection to interstate commerce is small. See United States v. Foster, No. 05-1741, slip opinion at 6-7 (8th Cir. Apr. 11, 2006) ("'where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence'") (quoting Lopez, 514 U.S. at 558); United States v. Mugan, 441 F.3d 622 (8th Cir. 2006) (rejecting a commerce clause challenge to federal child pornography convictions under 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B), both of which contain an express jurisdictional nexus to interstate commerce). We must conclude that the present robbery involved a sufficient nexus to interstate commerce to qualify as a Hobbs Act violation.

F.  Dobbs's Possession or Use of the Firearm under 18 U.S.C. §§ 922 and 924.

Dobbs was indicted and convicted of aiding and abetting on the gun counts.[5] 18 U.S.C. § 2(a) defines "principal" to include persons who aid or abet others in the commission of an offense.  Also, 18 U.S.C. § 2(b) states, "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  By directing Wilson's actions during the robbery and therefore during the use of the gun, 18 U.S.C. § 2(b) makes Dobbs punishable as a principal based on Wilson's possession and use of the gun.

G. Sentencing Issues: Wilson's Life Sentence under § 3559.

Turning to sentencing issues, the district court found that Wilson had two prior convictions for "serious violent felon[ies]" under 18 U.S.C. § 3559 (c)(1)(A)(i).  One of the prior convictions was a 1998 Illinois burglary conviction under a statute that did not require proof that Wilson used violence, threats of violence, or possessed a weapon.  The other was a 1992 Illinois armed robbery conviction.  Wilson argues that the burglary conviction does not qualify as a serious violent felony under §3559.  We agree.

---

[5]In the superceding indictment, the charges against Dobbs were:

Count 1:     Interference with Commerce by robbery in violation of 18 U.S.C. § 1951.

Count 2:     Carrying and Using a Firearm and Aiding and Abetting the Use and Carrying of a Firearm in violation of 18 U.S.C. § 924(c), and that the firearm was brandished (18 U.S.C. § 924(c)(1)(A)(ii)).

Count 3:     Possessing or Aiding and Abetting the Possessing of a Firearm in violation of 18 U.S.C. § 922(g).

-14-

The government relies exclusively on precedent under 18 U.S.C. § 924(e)(2)(B) ("violent felony") and U.S.S.G. § 4B1.2(a)(2) ("crime of violence") to argue that burglary is a serious violent felony under § 3559. These other provisions do not contain the specific term serious violent felony. They do expressly list burglary as a violent felony or crime of violence, respectively, but we can find no support for the proposition that Congress intended the separate term serious violent felony to be synonymous with crime of violence or violent felony. Further, we do not presume that Congress intended the modifier "serious" to be meaningless, as would be the case if we were to read § 924(e) as being coextensive with § 3559.

Most convincing on this point is the text of § 3559 itself. 18 U.S.C. § 3559(c)(3)(A) expressly exempts from the definition of "serious violent felony" *robberies* that do not involve the use of a firearm or dangerous weapon. No similar exception exists under § 924(e)(2)(B) or U.S.S.G. § 4B1.2(a)(2), both of which clearly encompass robbery as a qualifying offense. Accordingly, § 3559 and these other provisions, on their faces, bear distinctions that militate against treating the three terms interchangeably.

This same exception demonstrates that Congress did not intend a burglary to be included within the definition of serious violent felony. The historical, common law definitions of robbery and burglary make robbery a more serious offense than burglary as robbery necessarily involves confrontation and the associated threats of violence or actual violence whereas burglary may occur without confrontation. Accordingly, it would run counter to the plain text of § 3559 to hold that Wilson's prior conviction under Illinois law for *burglary* without a firearm or dangerous weapon could satisfy the definition of "serious violent felony" when *robbery* without a dangerous weapon could not. Because the prior burglary conviction under Illinois law does not qualify as a serious violent felony, § 3559 and the mandatory life sentence under that section are inapplicable to Wilson.

III.

For the foregoing reasons, we affirm as to Dobbs and affirm the judgment of conviction as to Wilson. We vacate the life sentence imposed on Wilson and remand for resentencing without application of § 3559.

HEANEY, Circuit Judge, concurring.

I agree with the majority's thoughtful analysis and conclusion, but write separately to express my concern with the United States Attorney's office asserting federal jurisdiction over this criminal case. The United States district courts are extremely burdened with civil and criminal cases that clearly merit decisions by a federal court. The Northern District of Iowa, like many other districts, is overwhelmed with criminal cases. According to the Administrative Office, the Northern District of Iowa handled 22% of the total criminal matters and 33% of the total sentencing hearings by district courts in this circuit for the twelve-month period ending September 30, 2005. Moreover, the federal prosecutor's assertion of jurisdiction contradicts the stated policy of the United States Attorneys' Manual. Nonetheless, this circuit's precedent requires that we find that this case's tenuous nexus to interstate commerce is sufficient to create federal jurisdiction under the Hobbs Act.

In our federal system, "[t]he States possess primary authority for defining and enforcing the criminal law." Engle v. Isaac, 456 U.S. 107, 128 (1982); see also United States v. Lopez, 514 U.S. 549, 564 (1995) (recognizing historical sovereignty of states in criminal law enforcement). As former Chief Justice Rehnquist stated, "'the traditional principle of federalism'" is that criminal matters "'that can be adequately

handled by the states should be left to them. . . .'" J. Kelly Strader, <u>The Judicial Politics of White Collar Crime</u>, 50 Hastings L.J. 1199, 1258 (1999) (quoting "Chief Justice Criticizes Trend Toward Federalization of Crime," 66 U.S.L.W. 2722 (May 26, 1998)). Dobbs and Wilson were each convicted in federal court of committing armed robbery, 18 U.S.C. § 1951(a), and for being felons in possession of a firearm, § 922(g). Iowa's code criminalizes and mandates state law penalties similar to these federal provisions. <u>Compare</u> Iowa Code § 711.2 (robbery in the first degree), § 724.26 (possession of a firearm by felon), § 702.11 (classifying robbery in the first degree is a "forcible felony"), § 902.7 (setting minimum sentence for use of a dangerous weapon during the commission of forcible felony), <u>and</u> § 902.8 (setting minimum sentence for habitual offenders), <u>with</u> 18 U.S.C. § 1951(a) <u>and</u> 18 U.S.C. § 924.

The Hobbs Act applies to robberies that "in any way or degree" obstruct, delay, or affect commerce. 18 U.S.C. § 1951(a). Under the current state of the law in this circuit, it is hard to conceive any robbery of any entity involved in selling any product, that would not affect interstate commerce. <u>See</u> <u>United States v. Quigley</u>, 53 F.3d 909, 910 (8th Cir. 1995) ("When a business that sells goods manufactured outside the state is robbed, interstate commerce is usually sufficiently affected for the purposes of [18 U.S.C.] § 1951(a).") In <u>United States v. Farmer</u>, 73 F.3d 836, 843 (8th Cir. 1996), we noted that the text of the Hobbs Act does not exclude single local robberies, so long as the robbery affects, obstructs, or delays "commerce or the movement of any article or commodity in commerce." We then determined that <u>United States v. Lopez</u>, 514 U.S. 549 (1995), had "no application to cases of commercial establishments, such as the [retail] store involved" there. <u>Farmer</u>, 73 F.3d at 843. The circumstances of this case are far different from our previous Hobbs Act cases. <u>See, e.g.,</u> <u>United States v. Williams</u>, 308 F.3d 833, 836 (8th Cir. 2002) (robbery-victim taxi driver "frequently transported Federal Express employees, railroad crew members, and packages moving in interstate commerce" and "also regularly transported passengers to and from the

Eastern Iowa Airport"); United States v. Vong, 171 F.3d 648, 650 (8th Cir. 1999) (armed robberies of several jewelry stores); Farmer, 73 F.3d at 843 (robbery of one location and the conspiracy to rob several other locations of a chain grocery store with "162 food stores, 38 convenience stores, and 20 drug stores in seven states"). Here, the federal prosecutor exerted jurisdiction over a one-time robbery of a convenience store at a single location. It is hard to imagine a robbery of a commercial establishment with less of a connection to interstate commerce than this one. The store purchased the majority of its products from an in-state wholesaler, the robbery was not part of a larger conspiracy, and it yielded only $565.00.

Finally, assertion of federal jurisdiction over this case violates the United States Attorneys' written policy. "The robbery offense in 18 U.S.C. § 1951 is to be utilized only in instances involving organized crime, gang activity, or wide-ranging schemes." United States Attorneys' Manual § 9-131.040 (emphasis added). Although the robberies in Farmer, 73 F.3d 843 (conspiracy to rob several stores), and Vong, 171 F.3d at 650 (robberies of several jewelry stores), fit under the "wide-ranging schemes" language, this case involved but a single robbery. Thus, the assertion of jurisdiction here cannot be reconciled with the government's own policy of cases on which it ought to expend federal resources.

Accordingly, I question why the United States Attorney did not leave this case to the state of Iowa, but nonetheless agree that our circuit precedent requires that we find federal jurisdiction did exist.

_____

-18-