# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4534

_____

United States of America

*Plaintiff - Appellee*

v.

Mikeem Daniel

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: December 15, 2017
Filed: April 4, 2018

_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.

_____

SMITH, Chief Judge.

Mikeem Daniel appeals after a jury convicted him of (1) aiding and abetting the interference with commerce by robbery, and (2) aiding and abetting the possession of a firearm in furtherance of a crime of violence. He challenges the sufficiency of the evidence supporting the convictions. Daniel also argues that the

district court[1] erred in denying a motion to suppress and in its jury instructions. We affirm.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdict." *United States v. Payne–Owens*, 845 F.3d 868, 870 n.2 (8th Cir. 2017) (quoting *United States v. Stevens*, 439 F.3d 983, 986 (8th Cir. 2006)). After St. Joe's General Store in Perryville, Missouri, had closed, clerk Angela Corse worked to prepare the store for the next day. The back door was unlocked and propped opened for cleaning. As Corse faced away from that door, someone entered the store behind her, wrapped his arm around her, and pressed a gun to her back. The unknown male asked for money and pushed Corse toward the cash registers, where he made her pull cash from the drawer. Corse never saw the man's face but believed he was African American based on the appearance of his hand when he took the cash. The man then grabbed Corse's wallet off the counter and pushed Corse to the rear of the store. He shoved her aside and pointed a gun at her before running out the back door.

As the man fled from the store, Corse saw a white Suburban driving slowly on the road parallel to the back of the store. The vehicle's brake lights illuminated, and the man went towards the Suburban. Once Corse realized where he was going, she shut and locked the door and immediately called 911. Corse reported that she had been robbed at gunpoint and that the suspect had left in a white Suburban driven by someone else. She also described the individual's clothing, race, and the color of the gun she had seen pointed at her—silver. The dispatcher immediately relayed this information to Perryville and Perry County law enforcement.

---

[1]The Honorable Stephen N. Limbaugh Jr., United States District Judge for the Eastern District of Missouri.

Perry County Sheriff's Deputy Rusty Farrar responded to the call reporting an armed robbery at St. Joe's General Store. Farrar heard the description of a white Suburban and immediately headed towards the store. After only a couple of blocks, he noticed a white Suburban driving in the opposite direction in the oncoming lane. Farrar activated his lights and sirens and pursued. The Suburban pulled over, and Farrar called for backup. Two officers soon arrived. Peering into the vehicle, the officers observed a woman's wallet behind the driver's seat. The officers identified Daniel as the driver of the Suburban. Darion Gipson was the passenger. Daniel initially argued with Farrar over the traffic stop, but he ultimately consented to a search of the vehicle.

The search revealed that the women's wallet behind the driver's seat was Corse's. Near the wallet, the officers found a hoodie similar to the one worn by the person who attacked Corse. Gipson had on no jacket or sweatshirt. The searching officer found a loaded black 9mm pistol in the space underneath the front seat cupholder. Gipson had $349 in cash in his pocket—the precise amount a later audit revealed was taken from the store's cash register. The officers never found a silver gun.

Daniel went to trial, and the jury convicted him of aiding and abetting the interference with commerce by robbery, in violation of 18 U.S.C. §§ 2 and 1951, and aiding and abetting the possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A)(ii). On appeal, Daniel argues that the district court erroneously denied a pretrial motion to suppress evidence obtained in the traffic stop. He also challenges the sufficiency of the evidence as to both convictions. Finally, Daniel contends that the jury instructions were erroneous.

## II. *Discussion*

### A. *Motion to Suppress*

We first address the district court's denial of the motion to suppress. "We review the denial of a motion to suppress *de novo* but the underlying factual determinations for clear error, giving due weight to inferences drawn by law enforcement officials." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (quoting *United States v. Hurd*, 785 F.3d 311, 314 (8th Cir. 2015)).

Daniel argues that Farrar did not have reasonable suspicion to stop the suburban. "An officer may conduct a Fourth Amendment stop to investigate a crime only if the officer has a reasonable suspicion that that person had committed or was committing a crime." *United States v. Juvenile TK*, 134 F.3d 899, 902 (8th Cir. 1998) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In justifying the stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "[T]he facts [are] judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21–22 (quotations omitted). "[D]ue weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27 (citation omitted). When a traffic stop is based on a radio dispatch, factors such as "the temporal and geographic proximity of the car to the scene of the crime, [a] matching description of the vehicle, and the time of the stop" are highly relevant to a finding of a reasonable suspicion. *Juvenile TK*, 134 F.3d at 903.

The district court found the following facts in denying Daniel's motion to suppress. Farrar heard dispatch report an armed robbery at the St. Joe's General Store and that the suspect was in a white Suburban. Farrar immediately started driving towards the store, then saw a white Suburban driving in the oncoming lane on the highway. He passed it, made a U-Turn, and stopped the Suburban. The stop occurred within minutes of the dispatch. Farrar admitted that the vehicle had committed no traffic violation; rather, the stop "was just based on the radio dispatch." Transcript of Hearing on Motion to Suppress at 87, *United States v. Daniel*, No. 1:16-cr-00006-SNLJ-1 (E.D. Mo. Mar. 24, 2016), ECF No. 54. As the district court noted, all this occurred late at night when there was very little traffic on the roadway. Based on the evidence presented at the suppression hearing, these factual findings are not clearly erroneous. *Mosley*, 878 F.3d at 251.

These facts support reasonable suspicion. Considering "the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop," *Juvenile TK*, 134 F.3d at 903, we hold that an officer in Farrar's position would have reasonable suspicion to justify stopping the Suburban. *See id.* at 901–04 (holding reasonable suspicion existed for a *Terry* stop two blocks away from the reported crime and five to seven minutes after dispatch identified a gray vehicle engaging in criminal activity in the early morning hours); *United States v. Farnell*, 701 F.3d 256, 258–59 (8th Cir. 2012) (holding reasonable suspicion existed for a *Terry* stop an hour after dispatch described robbery suspect's vehicle as a white van and the suspect as a heavy white male wearing certain clothing, and an officer observed a white van whose driver was a heavy white male wearing different clothing, and who held up his hand to conceal his face).

On appeal, Daniel points out that when cross-examined, Farrar admitted that as he made the U-turn, he heard on the police radio traffic "of the vehicle possibly headed towards the square in Perryville"—the opposite direction from the way the Suburban was heading. Transcript of Hearing on Motion to Suppress at 89. Farrar

-5-

stopped the Suburban anyway. Our conclusion is unchanged by the radio report's vehicle direction information. An officer exercising "reasonable caution" would believe it appropriate to conduct an investigatory stop of the Suburban. *See Terry*, 392 U.S. at 21–22.

Nor does Farrar's admission that he followed a "hunch" affect our conclusion. We note from the transcript that Farrar merely affirmed the word "hunch" in response to a leading question on cross examination: "But you followed up on a hunch and stopped the car; is that correct?" Transcript of Hearing on Motion to Suppress at 90. Despite Farrar's "yes," we conclude that, based on the facts he knew at the time and expressed at the hearing, and the reasonable inferences from those facts, Farrar had more than an "unparticularized suspicion or hunch"—he had reasonable suspicion that criminal activity was afoot. *Terry*, 392 U.S. at 27. The district court's denial of the motion to suppress is affirmed.

### B. *Sufficiency of the Evidence*

Daniel next argues that the evidence was insufficient to sustain either of his convictions. "We review de novo whether the evidence presented at trial was sufficient to prove that the accused was guilty beyond a reasonable doubt." *United States v. Moe*, 536 F.3d 825, 832 (8th Cir. 2008) (citation omitted). "[W]e view all the evidence in the light most favorable to the verdict" and "will not re-weigh the evidence and will resolve all credibility issues in favor of the verdict." *Id.* (citation omitted). "[W]e will reverse only if no reasonable jury could have found the accused guilty beyond a reasonable doubt." *Id.* at 833 (citation omitted).

### 1. *Aiding and Abetting Firearm Possession*

For a person to be convicted as an aider and abettor he must have "facilitated any part—even though not every part—of a criminal venture." *Rosemond v. United States*, 134 S. Ct. 1240, 1246 (2014). An individual can aid and abet a violation of § 924(c) "by facilitating either the [underlying crime of violence] or the firearm use

(or of course both)." *Id.* at 1247. In this case, "[Daniel] may be convicted of abetting a § 924(c) violation *only* if his intent reache[d] beyond a simple [crime of violence], to an armed one." *Id.* at 1248 (emphasis added). The intent element is satisfied by proof of "full knowledge of the circumstances constituting the charged offense." *Id.* at 1248–49. "An active participant in a [crime of violence] has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture," fully aware the crime will be "an armed one." *Id.* at 1249. The "defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice." *Id.* Thus, "an unarmed accomplice cannot aid and abet a § 924(c) violation unless he has foreknowledge that his confederate will commit the offense with a firearm." *Id.* (quotation omitted).

Daniel argues that there is insufficient proof that he had prior knowledge that Gipson would carry, use, or possess a gun and that we must reverse his conviction on this count. We disagree.

Trial evidence established that Daniel drove the Suburban in which Gipson fled from the robbery scene. Given the lateness of the hour (near midnight), the Suburban's slow travel, its proximity to the store, and Gipson's running to it, a reasonable jury could infer that Daniel intended to be Gipson's getaway driver all along. Of course, this latter inference does not answer the necessary question: whether Daniel knew Gipson would not only conduct a robbery, but an *armed* one. *See id.*

The robbery was armed. The clerk in the store reported having a handgun placed against her back and recalled seeing a silver tip on the handgun when it was pointed at her before the robber fled. The gun found in the Suburban was black, not silver. However, a jury could reasonably infer that the pistol found in the Suburban

-7-

minutes after the robbery was the same one Gipson used during the robbery. Daniel argues hard that the clerk's testimony about a silver gun shows that the *black* gun found in the Suburban could not have been the gun used during the robbery. He contends this discrepancy, at the least, creates a reasonable doubt. This argument could have worked before the jury. On appeal, however, the jury's verdict receives the benefit of reasonable inferences that might be drawn in its favor.

At trial, Corse testified she saw a silver gun, but then hedged by stating "[i]t was just the very tip of the barrel . . . . facing at [her.]" Transcript of Jury Trial at 160, *United States v. Daniel*, No. 1:16-cr-00006-SNLJ-1 (E.D. Mo. Sept. 15 & 19, 2016), ECF No. 129. Though she again answered affirmatively when asked if "[she] got the jacket correct," she also acknowledged that "[i]t was dark." *Id.* at 161. Corse also testified that she was very afraid during the entire robbery. The jury could have rationally inferred that Corse honestly thought the gun was silver, but decided that she was mistaken due to the excitement of the moment and the available lighting. The jury viewed a security camera recording of robbery events at the cash register. Though the video is blurry, it shows Gipson press something against Corse's back. Both individuals' dark clothing makes it difficult to see the details of anything in Gipson's hand—silver, black, or otherwise. Corse's testimony places a gun in Gipson's hand aimed directly at her in a threatening manner. The video is inconclusive as to the gun's color. The jury heard the testimony and likely believed that Corse's recollection of a silver barrel tip was mistaken. Daniel asks us to reweigh this evidence, but we may not. *See Moe*, 536 F.3d at 832.

Daniel points out that the black pistol in the Suburban was located underneath a cupholder containing two cups full of soda. He highlights the improbability of Gipson's hurriedly entering the Suburban, removing the full cups and cupholder, hiding the gun underneath, and replacing the cupholder and cups. Daniel contrasts this apparently careful behavior with Gipson's haphazardly tossing Corse's wallet into the back seat, and tucking the incriminating $349 in cash in his pocket. All this,

Daniel says, means the jury necessarily would have had a reasonable doubt that Daniel had advance knowledge that a gun would be used.

We must view the above evidence in the light most favorable to the guilty verdict, and we conclude a reasonable jury could have found that the gun Gipson used was the same gun found in the Suburban afterwards. A jury could reasonably infer that Gipson stowed the loaded weapon underneath the cupholder, intending to quickly hide it in a seemingly inaccessible spot, rather than throwing it in the back seat with the other items. The presence of the gun in the vehicle Daniel drove could also support the reasonable inference that Daniel knew—in advance—that Gipson would use a gun.[2] There was no evidence that Daniel abandoned Gipson's criminal endeavor after Gipson entered the Suburban. A jury can infer advance knowledge "if a defendant continues to participate in a crime after a gun was displayed or used." *Rosemond*, 124 S. Ct. at 1250 n.9. Although the robbery itself ended before Gipson returned to the vehicle, the jury can "draw inferences about a defendant's intent based on *all the facts and circumstances* of a crime's commission." *Id.* (emphasis added).

We will reverse Daniel's conviction based on insufficient evidence "only if no reasonable jury could have found [Daniel] guilty beyond a reasonable doubt." *Moe*, 536 F.3d at 833 (citation omitted). That is not this case. We hold there was sufficient evidence for a jury to find Daniel guilty of aiding and abetting the possession of a firearm in furtherance of a crime of violence.

### 2. *Aiding and Abetting Hobbs Act Robbery*

Daniel next argues we must overturn his conviction for aiding and abetting Hobbs Act robbery. The Hobbs Act penalizes anyone who "in any way or degree

---

[2]This conclusion is also strengthened by evidence showing the gun belonged to one of Daniel's relatives. Though the jury did not have to do so to convict, it could have found based on this evidence that Daniel actually furnished the gun for the crime.

obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). The government must "show that a robbery affected interstate commerce." *United States v. McAdory*, 501 F.3d 868, 871 n.5 (8th Cir. 2007).

Daniel contends specifically that there was insufficient evidence to establish that the robbery affected commerce as the Hobbs Act requires. He says that because St. Joe's General Store was closed when Gipson robbed it, neither its business nor inventory could have been affected. And Daniel points to evidence that the store's operations were not affected, as established by the store manager's testimony showing that, after the night of the robbery, business continued as usual.

We have stated that Congress likely "had in mind primarily offenses with a broad impact on interstate commerce," but the Hobbs Act's actual "words in no way exclude prosecutions for single local robberies, so long as . . . commerce or the movement of any article or commodity in commerce is obstructed, delayed, or affected." *United States v. Farmer*, 73 F.3d 836, 843 (8th Cir. 1996). If a business sells products coming from different states and has stores in various states, the Hobbs Act protects these "businesses that are part of an interstate chain." *Id.* (citation omitted). In *Farmer*, we affirmed a Hobbs Act conspiracy conviction where the would-be robbers were thwarted after they entered a convenience store. *Id.* at 839. The conspirators planned to rob the store, and the fact that the intended robbery victim dealt generally in out-of-state goods satisfied the "effect on commerce" element. *See id.* at 839, 843 ("Evidence about the business operations of [the company], whether in Waterloo or Des Moines, is relevant to show the effect on commerce of an interference with business at the Waterloo store."); *see also United States v. Vong*, 171 F.3d 648, 654 (8th Cir. 1999) (holding there was an impact on interstate commerce for purposes of the Hobbs Act where the defendant admitted the indictment's factual allegations, including that the robbed stores sold jewelry manufactured out of state and shipped to the stores using interstate transportation).

The Hobbs Act robbery victim "need not be a large, interstate chain." *United States v. Dobbs*, 449 F.3d 904, 912 (8th Cir. 2006). Rather, "robberies from small commercial establishments qualify as Hobbs Act violations so long as the commercial establishments deal in goods that move through interstate commerce." *Id.* In *Dobbs*, we affirmed a Hobbs Act conviction where trial testimony established "the interstate nature of the store's business." *Id.* at 907. For example, a beverage supplier testified that his company's products were produced out of state, and many of the store's customers were from out of state. *Id.* at 908. The crime thus had "a sufficient nexus to interstate commerce to qualify as a Hobbs Act violation." *Id.* at 912.

At Daniel's trial, the store manager testified that the store sells gasoline, liquor, and cigarettes that are all supplied or manufactured outside Missouri. One of the store's suppliers testified to the same. This testimony sufficiently establishes the robbery's effect on interstate commerce. *See id.* Daniel's argument that the store continued to buy the same products from the same suppliers after the robbery misses the point. Our cases have not so limited effects on interstate commerce. Causing a business to close may definitely affect interstate commerce, but the business need not cease operation for the defendant's robbery to affect interstate commerce. Daniel also cites to *United States v. Chaplain*, where we stated "[w]here a business is forced to close for a period of time, a court is especially likely to find that the robbery affected interstate commerce." 864 F.3d 853, 858 (8th Cir. 2017) (citation omitted). But we did not hold that the business *must* be forced to close in order to find an effect on commerce—the stores' closures simply reinforced the "effect on commerce" finding, but was not necessary to it. The "effect on commerce" element can be met because the company deals in interstate products. *Farmer*, 73 F.3d at 843. So too, here, the continuity of the store's business does not preclude the finding of an effect on commerce. For better or worse, our precedent gives the Hobbs Act extensive reach. The St. Joe's General Store "deal[s] in goods that move through interstate commerce." *Dobbs*, 449 F.3d at 912. Under our binding precedent, this is sufficient

to establish the requisite nexus to interstate commerce. We affirm Daniel's conviction for violating the Hobbs Act.

## C. *Jury Instructions Nos. 8 and 9*

Daniel's final argument on appeal is that the district court erroneously instructed the jury. We review jury instructions for an abuse of discretion. *United States v. Thompson*, 686 F.3d 575, 579 (8th Cir. 2012). "We will affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." *Id.* (quotation omitted). But we reverse "when the errors misled the jury or had a probable effect on the jury's verdict." *Id.* (citation omitted). "A district court has broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *United States v. Garcia–Gonon*, 433 F.3d 587, 591 (8th Cir. 2006) (citation omitted).

As to intent, the district court instructed the jury with the following language:

> You *may infer* the defendant had the requisite advance knowledge of the robbery if you find the defendant failed to object or withdraw from actively participating in the commission of interference with commerce by robbery after the defendant observed another participant *complete* the robbery.

Jury Instructions at 10, *United States v. Daniel*, 1:16-cr-00006-SNLJ-1 (E.D. Mo. Sept. 19, 2016), ECF No. 98 (emphasis added). Daniel objects to the italicized portions in the above-quoted instruction and the same language in Instruction No. 9.[3] We address each of his two contentions in turn.

---

[3]The instruction on the aiding and abetting the firearm possession count contained identical language in all relevant respects. *See* Jury Instructions at 12 (Instruction No. 9). Our analysis applies equally to both.

### i. *"May Infer"*

Daniel first argues that the district court should have instructed that the jurors "may *but are not required to* infer" his intent based on a failure to object or withdraw, rather than instructing only that the jury "may infer" the same. He points to other model instructions, as well as other instructions within the set given here, that use "may but are not required to infer." He says the jury might have noted the omission of "but are not required to" and took its conspicuous absence to mean the government had a lesser burden of proof.

We are not persuaded. The instruction tracked the aiding and abetting instruction in the Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit. It is true that a later instruction in Daniel's case used the phrase "You may, but are not required to, infer." Jury Instructions at 13. But there is no reason to think the omission in a different instruction misled the jury. Omitting the phrase "but are not required to" does not change the normal meaning of the phrase. "May" is not "must," and it does not imply a requirement, but permission. Black's Law Dictionary first defines the word "may" as "[t]o be permitted to." *May*, Black's Law Dictionary (10th ed. 2014). In other words, the jury was permitted to make the inference or not. There is no reason to think the jury did not apply this commonly understood meaning.

Viewing the entire charge, we conclude the instructions clearly and correctly explained the government's burden. Jury Instructions at 5 ("The presumption of innocence . . . can be overcome only if the Government proved, beyond a reasonable doubt, each element of a crime charged."). The government's burden was not lessened as Daniel contends. The district court did not abuse its discretion in using "may infer" rather than "may but are not required to infer" in Instructions 8 and 9.[4]

---

[4]Moreover, we note that Daniel's counsel argued the meaning of the word "may" to the jury in closing, stating about the word, "what does that mean? You don't

## ii. *"Complete the Robbery"*

Daniel's final argument contends that the district court abused its discretion by instructing the jury that it could infer advance knowledge if Daniel failed to object or withdraw after he observed "another participant *complete* the robbery." Instead, he says, the district court should have used the phrase "another participant *committing* the robbery." Thus, in relevant part in Instruction 8, Daniel contends the court should have instructed:

> You may but are not required to infer the defendant had the requisite advance knowledge of the robbery if you find the defendant failed to object or withdraw from actively participating in the commission of interference with commerce by robbery after the defendant observed another participant *committing* the robbery.

Defendant's Proposed Jury Instructions at 4, *United States v. Daniel*, No. 1:16-cr-00006-SNLJ-1 (E.D. Mo. Sept. 11, 2016), ECF No. 88 (emphasis added).

Daniel says the instruction given makes little sense: How could an individual withdraw from "actively participating in the *commission*" of a crime, after the crime is *complete*? The government responds that to instruct the jury that it could not infer advance knowledge based on a defendant's actions after the crime is complete, would mean "no getaway driver waiting in a nearby car could be convicted of aiding and abetting the robbery." Appellee's Br. 43.

The model instruction from which this instruction was taken is based on a footnote in the *Rosemond* case. *See* Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit § 5.01. In that footnote, the Supreme Court

---

have to infer that. You have to look at the facts and see what the facts show." Transcript of Jury Trial at 418.

-14-

commented that "if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such [fore]knowledge." *Rosemond*, 134 S. Ct. at 1250 n.9. This language means that if a defendant continues to participate in a crime as the crime proceeds, after a confederate displays or uses a gun, the jury can infer from the defendant's failure to object or withdraw at the time he became aware of the gun that he had foreknowledge that his confederate would use one. *See id.* at 1249. The *Rosemond* Court simply did not speak to a jury's ability to make the same inference if the defendant failed to "withdraw" or object after the crime was *complete*.

But *Rosemond* did not hold, or even state, that a jury could not infer foreknowledge based on a defendant's post-crime conduct. A jury may do so. Indeed, in the sentence immediately following the above-quoted language, the *Rosemond* Court itself explained, "after all, the factfinder can draw inferences about a defendant's intent based on *all the facts and circumstances of a crime's commission*." *Id.* at 1250 n.9 (emphasis added). The district court instructed the jury accordingly here. Jury Instructions at 13 ("Intent or knowledge may be proved like anything else. You may consider any statements made and acts done by the defendant, and all the facts and circumstances in evidence which may aid in a determination of defendant's knowledge or intent."). Thus the jury knew it could consider all the evidence—including evidence of Daniel's conduct before, during, and after the robbery took place—in order to determine his intent.

The district court also explicitly instructed the jury that, to convict Daniel of aiding and abetting interference with commerce by robbery, Daniel must "have had enough advance knowledge of the extent and character of the robbery that he was able to make the relevant choice to walk away from the robbery before all elements of interference with commerce by robbery were complete." Jury Instructions at 9; *see also id.* at 11 (same in Instruction 9). This instruction correctly emphasized that the

jury must find Daniel had *advance knowledge* that the robbery would be armed, in order to convict him on this count. *See Rosemond*, 134 S. Ct. at 1249–50.

The challenged word "complete" in Instructions 8 and 9 did not mislead the jury nor did it have a probable effect on the verdict. *See Thompson*, 686 F.3d at 579. We conclude, viewing the entire charge to the jury and reading it as a whole, that the district court fairly and adequately instructed the jury on the law applicable to the case and did not abuse its discretion. *See id.*

III. *Conclusion*

We affirm.

_____