# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1894

_____

United States of America

*Plaintiff - Appellee*

v.

Beth Galloway

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: November 15, 2018
Filed: February 26, 2019

_____

Before BENTON, BEAM, and ERICKSON, Circuit Judges.

_____

BEAM, Circuit Judge.

A jury convicted Beth Galloway of mail fraud in violation of 18 U.S.C. § 1341; use of fire and aid and abet the use of fire to commit a felony (here, mail fraud) in violation of 18 U.S.C. §§ 2 and 844(h); and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i). Following the verdict, Galloway filed motions for new trial and/or judgment of acquittal that the district

court[1] denied. Galloway appeals, challenging the sufficiency of the evidence on all counts. For the reasons stated herein, we affirm.

## I.    BACKGROUND

"We recite the facts in the light most favorable to the jury's verdict." United States v. Daniel, 887 F.3d 350, 353 (8th Cir. 2018) (quoting United States v. Payne-Owens, 845 F.3d 868, 870 n.2 (8th Cir. 2017)).

James Plower's house in Martelle, Iowa, burned down on July 25, 2013. At the time, the house was empty because Plower had moved in with his then-girlfriend, Galloway, who lived in Olin, Iowa. The fire department determined the fire started in the back room of the basement near a light fixture. After the fire, authorities received a tip from an arson hotline and an investigation ensued, resulting in the instant charges against Galloway.

At trial, Plower testified as a cooperating witness for the government after pleading guilty to mail fraud and use of fire to commit a felony for setting the fire that consumed his home. He testified about his romantic relationship with Galloway and explained his financial situation just prior to the fire, including that he was living paycheck to paycheck. He explained that the situation worsened when Galloway lost her job and that the couple discussed ways to get money, which included legitimate ideas like redoing the house to sell, as well as the questionable idea to set the house on fire. Plower said that the two talked about ways to accomplish the fire. He also testified that Galloway knew about fire investigations because she had been a member of the Onslow fire department.

---

[1]The Honorable Leondard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

The jury heard testimony from Plower and others regarding multiple attempts to set fire to the house prior to Plower's successful attempt on July 25, 2013. Plower testified that two weeks prior, Galloway left their house in the middle of the night, told Plower she was "going to the Martelle house," and when she returned she told him that "she couldn't get the house going." She told Plower she had tried to start the fire near the wall in the bathroom. Plower described another attempt a few days after that where he went to the house and attempted to light the hunting room ceiling in the basement with a propane torch. He started a small fire and went home to wait with Galloway for a radio alert, but none came because the fire apparently extinguished itself. It was Plower's next attempt, on July 25, that was successful. This time he set fire to the same spot in the basement, went home, and he and Galloway heard the fire report over the radio. The two went to the Martelle house at that time.

Both of Galloway's sons, Isaac and Geffrey, testified. Isaac was equivocal on the stand when asked if he and his mother had attempted to start the house on fire and so a portion of his grand jury testimony was read to the jury. In that testimony, Isaac described a night where his mother drove him to the house in the middle of the night and he entered and tried to set a fire near the basement stairwell but that it didn't work. He said his mom "probably" knew he was going in with a lighter, she asked "did you get it?", when he got back in the car, to which he responded "yeah, I think it's going." Isaac said that Galloway stated "Jim [Plower] didn't need to know that I attempted to start the fire." A few days later Isaac said that he and his mom went back to make a second attempt, this time trying in a different location, with his mom asking if he was successful when he came out, and he was not. Galloway's son Geffrey also testified, stating that at one point after the fire Galloway advised him that Plower had started the house fire and that Galloway gave him instructions about what to do about his care and his siblings' care if she and Plower were arrested.

Plower testified about filing the insurance claim and authenticated documents in court showing payments that were made. He received checks from Nationwide

through the mail and deposited them at the bank and paid off the mortgage on the house. Plower explained that he and Galloway used the rest of the insurance proceeds to pay their living expenses, that Galloway additionally gave a portion of the proceeds to her father and that she also used some of the money herself to pay legal fees related to a child custody case. Ultimately investigators caught up with Plower and he admitted his criminal activity without implicating Galloway. He did, however, tell Galloway that he would have to take out some money before they froze his bank accounts and the two devised a plan to give the cash to a friend, Jean McPherson, for safekeeping. McPherson confirmed that Galloway and Plower jointly approached her and asked her to hold onto some cash for them. She testified that Plower and Galloway told her that Plower was under investigation and that their assets were being frozen so they needed cash to live on. McPherson agreed and believed it was Galloway who handed her the money. Galloway and Plower occasionally came to get money from McPherson.

An investigator with the Iowa State Fire Marshal's Office testified about his investigation of this matter. In addition to the primary origin in the basement, the investigator identified areas of secondary origin and a third origin point, both of which correlate with areas where Plower testified that Galloway attempted to start the fire, as well as the location of one of her son's unsuccessful attempts near the stairwell.

Following deliberation, the jury convicted Galloway on all counts.

## II.    DISCUSSION

### A.    Standard of Review

This court reviews the denial of a motion for judgment of acquittal de novo, "evaluating the evidence in the light most favorable to the verdict and drawing all

reasonable inferences in its favor." United States v. Almeida-Olivas, 865 F.3d 1060, 1062 (8th Cir. 2017). The court's denial of Galloway's motion for new trial is reviewed for an abuse of discretion. United States v. Blakeney, 876 F.3d 1126, 1134 (8th Cir. 2017).

## B.  Sufficiency Arguments

On appeal, Galloway argues as to each count that there was no evidence that she knew that Plower's Martelle house was insured, that Plower intended to make any fraudulent insurance claims to the insurance company, or that Galloway herself participated in making any false insurance claim. She argues that Plower was the named insured, that the insurance check was mailed to a P.O. box that she did not have access to, and that any attempts to burn the house that she coordinated were not connected in any way to making an insurance claim. She additionally argues as to count three particularly that there was no evidence that she participated in (or agreed to participate in) the financial transaction at issue, which involved the withdrawal of $10,000 from Wells Fargo by Plower. She reiterates that the evidence regarding the couple's placement of the $10,000 with McPherson does not fall within the definition of "financial transaction" and nothing connects her to the bank withdrawal. Without the evidence she highlights as missing, Galloway claims the government failed to prove the elements of the charges she faced and the district court should have granted her motion for judgment of acquittal or, alternatively, her new trial motion.

Addressing Galloway's evidentiary arguments, the district court acknowledged that the evidence in this matter was largely circumstantial and that much of the evidence came from co-conspirator testimony. The district court even recognized that this case "is closer than some," but held that despite the manner in which this evidence was presented, Galloway was not entitled to judgment of acquittal. We agree.

"A jury is free to adopt any reasonable inference supported by the evidence and we must view the facts and all reasonable inferences from those facts in a light most favorable to the jury's verdict." United States v. Mack, 343 F.3d 929, 934 (8th Cir. 2003). Here, reasonable jurors could conclude that Galloway was part of a scheme to set Plower's house on fire for the purpose of unlawfully obtaining insurance proceeds. As the district court held, the evidence wholly supports the inferences arising from Plower's and Galloway's poor financial situation, Galloway's own independent efforts to destroy the house by fire, the couple's discussions regarding a plan to fix the situation, her acquiescence in Plower's actions each time he returned home from his own attempts to burn the house, her conversations with Plower after the fire, as well as her conversations and dealings with McPherson. Too, it is wholly reasonable to infer that Galloway's own efforts to burn the house demonstrated her knowledge and desire to profit or benefit from insurance money and for no other reason, such as simply trying to get rid of the house to save Plower time and money in fixing it up, which inference she advocates on appeal. Plower testified that once he received the money, "we" used the money for paying bills and general living, and that both he and Galloway had paid bills in the past. Galloway's desire to avoid detection also supports an inference that she knew she was participating in a nefarious scheme and that it was something she did not want to get caught doing.

Galloway's sufficiency arguments amount to claims that *different* inferences should have been drawn from the evidence and she supplies various, legitimate facts in support of that claim. For example, she points to Plower's testimony that he did not discuss his efforts to set the house on fire with Galloway and that there is no testimony connecting Galloway's efforts with son Isaac, to those of Plower. Galloway points to the absence of direct evidence of her knowledge or any evidence of particular steps in furtherance of a crime involving Plower's insurance policy. This she claims to be the death knell of the proof necessary to establish that the fire was set for the purpose of committing insurance fraud. But that is not the lens through which we view this evidence. Adeptly choosing particular facts from the record and

-6-

arguing that each, in isolation, does not support the larger inference made by the jury, is not the appropriate standard we employ on appeal. "We cannot reject a jury's conclusions merely because the jury may have chosen the arguably weaker of two contradictory, albeit reasonable, inferences." Id.

The district court painstakingly reviewed the record in light of the elements of the offenses charged, along with the jury instructions provided, and found as to each element and count, that reasonable jurors could conclude that Galloway was guilty. We likewise find that the inferences the jury gleaned from the evidence presented were sufficiently strong to support the guilty verdicts beyond a reasonable doubt. United States v. Dale, 614 F.3d 942, 964 (8th Cir. 2010) (Arnold, J., concurring and dissenting in part) (cautioning that unless the inference a jury chooses to draw is sufficiently strong to support a guilty verdict beyond a reasonable doubt, a guilty verdict based on that inference cannot stand).

For the reasons stated herein, we affirm[2].

_____

[2]For the reasons that support our affirmation of the district court's denial of Galloway's motion for judgment of acquittal under a de novo standard of review, we find the court did not abuse its discretion in denying her motion for new trial.